201 F.2d 874
 NEWBERRY'S ESTATE et al.
v.
COMMISSIONER OF INTERNAL REVENUE.
COMMISSIONER OF INTERNAL REVENUE
v.
NEWBERRY'S ESTATE et al.
JOHN J. NEWBERRY TRUST NO. 1 et al.
v.
COMMISSIONER OF INTERNAL REVENUE (two cases).
 Nos. 10786-10789.
 United States Court of Appeals Third Circuit.
 Argued November 7, 1952.
 Decided February 11, 1953.
 
 Montgomery B. Angell, New York City (Thomas L. Zimmerman and Thomas J. Miller, New York City, on the brief), for taxpayers.
 L. W. Post, Washington, D. C. (Ellis N. Slack, Acting Asst. Atty. Gen., on the brief), for Commissioner of Internal Revenue.
 Before GOODRICH, KALODNER and HASTIE, Circuit Judges.
 HASTIE, Circuit Judge.
 
 
 1
 In these petitions for review the taxpayers complain that the Tax Court has improperly applied to the estate of Myrtle H. Newberry, deceased, the provisions of Section 811 (d)(2) of the Internal Revenue Code, 26 U.S.C. § 811 (d)(2), that the gross estate shall include any property interest which decedent may have transferred in trust, where, at the time of his death, the enjoyment of that interest was subject to change through exercise by the decedent of a power to alter or revoke. It is admitted that the trusts in controversy gave the decedent until her death such power of alteration. But they were created by transfer of her husband's property under a trust indenture executed solely by him. Nevertheless, the Tax Court, upholding the Commissioner of Internal Revenue, has ruled that in the particular circumstances of this case the decedent may properly be regarded and taxed as the transferor of the trust property within the meaning of Section 811 (d)(2). 17 T.C. 597.
 
 
 2
 In 1934 both John J. Newberry and his wife, Myrtle H. Newberry, were independently wealthy. Among other holdings, each owned about 50,000 shares of J. J. Newberry Company common stock, then valued at more than $50 per share. The Newberrys were deeply concerned for the future well being of their young children, a son and a daughter, neither of whom had independent means. In 1934 John Newberry created an irrevocable trust of 2500 shares of J. J. Newberry Company common stock for his daughter and a like trust for his son. In 1935 he repeated the process. In each trust he named himself and his wife as trustees and gave Mrs. Newberry alone broad power to alter, amend or terminate the trust, but in no event to revest principal or income in him. Before Mrs. Newberry's death in 1944, this power had been so limited by amendment of each instrument that no more could be done in its exercise than to shift interests among the Newberry issue, spouses of such issue and charities. Other amendments of the trusts were made from time to time but their provisions have no bearing upon this case.
 
 
 3
 On each occasion when Mr. Newberry executed one of these trusts Mrs. Newberry similarly executed a trust placing 2500 of her shares of J. J. Newberry Company common stock in trust for the same child. In each case she named herself and her husband as trustees and gave him the same powers of alteration as she was granted in the trusts created by him. Each time the husband amended the trusts he had created the wife made identical or equivalent changes in those she had created.
 
 
 4
 The Tax Court, in its findings of fact, had this to say about the circumstances under which these trusts were established:
 
 
 5
 "The idea of creating these trusts was first suggested to John J. Newberry by his brother, his business associate. After discussing the matter with his brother, John J. Newberry called in his attorney, with whom he discussed a plan that his brother had suggested. After John J. Newberry had the idea of creating the trusts `pretty well' fixed in his mind and shortly after he had first discussed it with his attorney he discussed it with his wife. He and she usually talked over matters as important as the trusts. They always handled the affairs of the family mutually. When decedent joined her husband and the attorney in the discussion she said that `* * * if it was a good thing to create these trusts, if John thought it was a good thing to create these trusts for the children, she did, too. She thought it was an excellent idea, and she wanted to do the same thing. She wanted to create the same type of trusts.'
 
 
 6
 "He suggested the trust idea to her; she was interested right away and thought it was a good plan. Her purpose in creating her two 1935 trusts was the same as his. The decedent never gave any indication that she might not possibly execute the trusts. * * *
 
 
 7
 "The Newberry children at the time of the creation of the trusts in 1934 and 1935 had no independent means of their own. They were very young and the decedent and her husband did not know what kind of lifemates they might choose. They had a great interest in the children and wished to protect their interest."
 
 
 8
 In addition, Mr. Newberry was positive in his testimony, and it was in no way rebutted, that he would have created his trusts regardless of whether Mrs. Newberry had decided upon a similar course. He also testified that the property placed in trust represented a small fraction of the wealth of each spouse and that neither of them contemplated any personal benefit or gain from corpus or income of any of the trusts.[1] Mr. Newberry testified further and the Tax Court found that powers to shift beneficial interests were incorporated in the trust indentures so as to make sure that no "schemers or ne'er-do-wells" should obtain control of the property in the unhappy event of an unfortunate marriage by either of the children for whose security the trusts were designed.
 
 
 9
 On this showing the Tax Court reached ultimate factual conclusions that in establishing, and from time to time amending, these trusts "the decedent and her husband were acting as a unit * * * and that the trust instruments were merely part of an interdependent arrangement whereby neither decedent nor her husband would lose control of the amount of the J. J. Newberry Company stock transferred to the trusts until they saw fit to do so". On this basis, the Tax Court ruled that Mrs. Newberry should be regarded as the settlor of the trusts created by her husband as well as the holder of a power to change the enjoyment of the trust estate. Accordingly, the court treated the property in question as part of decedent's gross estate under the requirement of Section 811 (d)(2) that the gross estate include any interests in property over "which the decedent has at any time made a transfer, by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power, either by the decedent alone or in conjunction with any person, to alter, amend, or revoke * * *."
 
 
 10
 This case decides the taxable status of the trusts in terms created by Mr. Newberry and those only. The narrow question is whether the Tax Court erred in treating Mrs. Newberry as the person who had "made a transfer" of this property in trust within the meaning of Section 811 (d)(2).
 
 
 11
 Normally taxing authorities and courts administering or applying a statute which taxes to a transferor's estate property he has transferred in trust reserving certain powers to himself have no occasion to go beyond the trust instrument in order to identify the transferor. At times, however, they have gone further. This procedure has been justified as necessary and proper to determine whether the significant shifting of economic interests and the change of dominion and control over property has been different from what the trust instrument itself indicates.[2] And if such analysis shows that another than the formal settlor is in reality the transferor, his estate may be taxed accordingly.
 
 
 12
 The most obviously appropriate occasion for the application of the principle would be presented by a transaction in which one of the formal parties had been essentially a "straw" acting for someone else. Tax consequences, like many other legal and economic consequences of such a transaction, would attach to the real party in interest.[3] A like result is clearly proper where, pursuant to a bargain and exchange, one party has given value to another to induce, and in consideration for, the creation of a trust by the second party wherein disposition is made of some beneficial interest as desired by the first party. Indeed, the taxing authorities need do no more than apply considered and accepted doctrine of the law of trusts[4] to reach the conclusion that he who pays another for the creation of a trust wherein the payor shall be granted a beneficial interest or a power which he desires may be taxed as one who has transferred property retaining an interest therein. This doctrine has been recognized and applied in a line of cases beginning with Lehman v. Commissioner of Internal Revenue, 2 Cir., 1940, 109 F.2d 99.[5] That leading case clearly turned upon the court's reasoning that "the transfer by the decedent's brother, having been paid for and brought about by the decedent, was in substance a `transfer' by the decedent, and the property so transferred formed part of his taxable estate by virtue of [the statutory predecessor of § 811 (d) (2)], to the extent that the decedent had power `to alter, amend or revoke' the enjoyment of it". 109 F.2d at pages 100-101.
 
 
 13
 It was also a fact in the Lehman case that the way the decedent, who was treated as transferor, had paid his brother for setting up the trust in question had been by setting up a similar trust conferring an equivalent benefit upon his brother. Thus, procedurally, the establishment of "reciprocal" or "crossed" trusts was a technical device for realizing the quid pro quo of a bargain.
 
 
 14
 The foregoing analysis is important because some of the subsequent cases which apply the Lehman doctrine have stressed the fact that trusts contained "reciprocal" or "crossed" provisions without spelling out that this circumstance is significant only to the extent that it may reveal a quid pro quo which another than the named grantor has paid for the creation of the trust in controversy. Actually, some of the cases seem to go rather far in inferring such payment or consideration in connection with reciprocal or crossed provisions.[6] But this court in In re Lueders' Estate, 3 Cir., 1947, 164 F.2d 128, has taken the lead in indicating that payment for the creation of a trust by another must be real if the alleged payor rather than the apparent settlor is to be treated as grantor of the trust.[7] The essential picture which the crossed trusts must reveal to justify the result reached by the Tax Court in the present case is a declared grantor induced to establish a trust giving the party now to be treated for tax purposes as the grantor, a power which the latter has wanted and has paid for by setting up another trust to accomplish something desired by the declared grantor. Such in our view are the rather strict confines of the Lehman doctrine.
 
 
 15
 What the Tax Court found in this case, and what happened, if the undisputed testimony is to be believed, falls short of the foregoing requirements. The "unity" of action of husband and wife and the "interdependent" character of their transactions which the Tax Court found are not such circumstances as the Lehman doctrine comprehends. Spouses in mutual confidence and common interest work out together what each is going to do with his own money to provide for their children. In the normal case, which this appears to be, it is a distortion of meaning to say that the action of one spouse is a quid pro quo inducing the action of the other. The only "consideration" is the historic "consideration of love and affection" for the dependent members of one's family. Similarity of action occurs because each spouse is confident that they together have arrived at a wise and benevolent decision concerning the future welfare of their children. That is all there is to the "unity" and "interdependence" of action revealed by such a record as we have here. Neither the substance of the transaction nor the identity of the actor is revealed as any different from what appears on the face of each trust indenture.
 
 
 16
 We have also considered that in the present decision and one or two others[8] the Tax Court may well be treating as special cases to be governed by rules of construction peculiar to them family trusts so created that husband and wife by separately granting each other powers over the enjoyment of trust property achieve essentially the same controls as would have resulted from reserving powers. Undoubtedly, in this connection as in others, domestic privacy and informality may effectively conceal understandings made and honored between husband and wife at variance with the formal and apparent aspects of family financial transactions. A bargain and exchange, within the meaning of the Lehman doctrine may exist, yet be unprovable. Moreover, regardless of any such bargain, there may be policy considerations favorable to legislation which for particular tax purposes would treat these crossed trusts of spouses like a single joint transaction with both spouses pro tanto transferors of the property over which each will thereafter have certain control. But, absent such legislation, when on the facts the conclusion is inescapable that each spouse by a distinct and bona fide transaction has dispensed of his own separate estate in accordance with his own personal desires and without receiving a quid pro quo from the other, we think a court cannot justifiably refuse to recognize each spouse as the real transferor of the trust he has formally created.
 
 
 17
 In the present case Mr. Newberry himself executed an operative indenture to transfer his own property in trust for the benefit of his children, pursuant to his personal desire to provide for their security. Of course, the total result of this transaction and the companion transaction of Mrs. Newberry, with each spouse granting a power to the other, could have been achieved by each spouse reserving a power in the trust he created. We have no doubt that the parties, advised by counsel, deliberately chose the alternative which appeared to entail the less burdensome tax consequences. But tax saving motivation does not justify the taxing authorities or the courts in nullifying, or disregarding, the taxpayer's otherwise proper and bona fide choice among courses of action.
 
 
 18
 Finally, the Tax Court approved a deduction of $25,000 from the gross estate in anticipation of expenses of apportionment proceedings which its decision would necessitate. There will no longer be occasion for such proceedings or for the deduction.
 
 
 19
 The decisions of the Tax Court will be reversed and the cases remanded for the entry of dispositive orders consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 These were New Jersey trusts. Whether the trustee could have employed his power to shift beneficial interests for his own advantage is as a matter of law at least doubtful. See In re Bender's Estate, 1937, 122 N.J.Eq. 192, 197, 192 A. 718, 721, affirmed, 1938, 123 N.J.Eq. 171, 196 A. 677; In re Kline, 1948, 142 N.J.Eq. 20, 59 A.2d 14. In any event it seems clear on the record that no such use of the power was intended or contemplated when the trusts were established. And it is agreed that amendments prior to decedent's death precluded any such use of the power
 
 
 [2]
 See 1 Paul, Federal Estate and Gift Taxation (1942) 310 ff
 
 
 [3]
 Grace D. Sinclaire's Estate, 1949, 13 T. C. 742; see Hall's Estate, 1946, 6 T.C. 933, 939
 
 
 [4]
 1 Scott, Trusts (1939) § 156.3
 
 
 [5]
 Followed in Hanauer's Estate v. Commissioner, 2 Cir., 1945, 149 F.2d 857; Cole's Estate v. Commissioner, 8 Cir., 1944, 140 F.2d 636, 151 A.L.R. 1139; Commissioner of Internal Revenue v. Warner, 9 Cir., 1942, 127 F.2d 913
 
 
 [6]
 E. g. Orvis v. Higgins, 2 Cir., 1950, 180 F.2d 537; Cole's Estate v. Commissioner, supra, note 5; Carrie S. Newberry, 1947, 6 T.C.M. 455, affirmed per curiam, 3 Cir., 1943, 172 F.2d 220; Eckhardt's Estate, 1945, 5 T.C. 673
 
 
 [7]
 The same approach and emphasis led the Tax Court to the same result where a third person had induced settlors separately to establish crossed trusts, one settlor not being advised what the other was doing. Samuel S. Lindsay's Estate, 1943, 2 T.C. 174
 
 
 [8]
 Particularly Werner A. Wieboldt, 1945, 5 T.C. 946; Carrie S. Newberry, supra, note 6