ESTATE of Joseph P. GRACE, Deceased, Michael P. Grace, II, Joseph Peter Grace, Jr., and Charles MacDonald Grace, Executors et al. ·

v.

The UNITED STATES.

No. 400—59.

United States Court of Claims.

April 19, 1968.

Davis and Nichols, JJ., dissented.

William S. Downard, Dallas, Tex., attorney of record, and Edward Gossett, for plaintiffs. Henry W. Strasburger and Frank L. Skillern, Jr., Dallas, Tex., of counsel.

Philip R. Miller, Washington, D. C., with whom was Asst. Atty. Gen. Mitchell Rogovin, for defendant.

OPINION

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, SKELTON, and NICHOLS, Judges.

PER CURIAM:

This case was referred to Trial Commissioner Mastin G. White with directions to make findings of fact and recommendation for conclusions of law. Following a trial on the merits, the commissioner filed an opinion and report, and the case was submitted to the court on the briefs of the parties. After hearing oral argument of counsel, we remanded the case to the commissioner for determination "whether the decedent [Joseph P. Grace] was motivated in the setting up of the Joseph Grace and the Janet Grace trusts, in December 1931, by the desire to avoid and lessen estate taxes." A further trial was held and thereafter the commissioner filed his supplemental report and a memorandum opinion.

After hearing additional oral argument and considering the briefs and exceptions of the parties, we have determined that the findings of fact made by the commissioner are amply supported by the record and that where such findings consist of

inferences based on circumstantial evidence, the inferences may reasonably be drawn from the record. The court is also in agreement with the opinions of the trial commissioner, as modified and combined into a single opinion, and hereby adopts the same, together with his findings of fact, as the basis for its judgment in this case.* Therefore, plaintiffs are entitled to recover and judgment is entered to that effect with the amount of recovery to be determined pursuant to Rule 47(c).

Commissioner White's opinions, as modified and unified by the court, are as follows:

The primary question to be decided in this case is whether the Internal Revenue Service acted correctly in adding to the gross estate of Joseph P. Grace, who died on July 15, 1950, the sum of $1,116,888.-62, representing the value of a trust that had been created on December 30, 1931.

The Internal Revenue Service purported to act under the authority of Section 811(c) of the Internal Revenue Code of 1939, as amended.[1] That section, at the time of the decedent's death, provided (among other things) that the value of the gross estate of a decedent should be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, "To the extent of any interest therein of which the decedent has at any time made a transfer * * * by trust or otherwise * * * under which he has retained for his life * * * the possession or enjoyment of, or the right to the income from, the property * * *."

It is clear that under the provisions of the trust of December 30, 1931, the decedent for his lifetime had the right to the income from the income-producing portion of the trust property, and that he was entitled to the possession and enjoyment of the remainder of the trust property. On the other hand, the decedent, at least in form, was not the settlor of the trust, he had not directly "made a transfer" of any property or interest in property to the trust, and, strictly speaking, he had not "retained" any beneficial interest in the trust property but, rather, had obtained such interest by virtue of the instrument creating the trust. The person who executed the instrument creating the trust of December 30, 1931, and who directly transferred to that trust all the property covered by it, was the decedent's wife, Janet Grace. (For the sake of convenience, the trust of December 30, 1931, will usually be referred to hereafter in the opinion as "the Janet Grace trust.")

The defendant contends that the decedent, by himself creating on December 15, 1931, a reciprocal trust which conferred on Janet Grace benefits similar to those which were conferred on the decedent by the Janet Grace trust, furnished consideration for the creation of the Janet Grace trust; and, therefore, that for estate-tax purposes the decedent and Janet Grace should be switched or crossed as settlors and the decedent should be regarded as having been in substance the settlor of the Janet Grace trust. This contention is based upon a judicially developed rule that was first announced in the case of Lehman v. Commissioner of Internal Revenue, 109 F.2d 99 (2d Cir. 1940), cert. denied 310 U.S. 637, 60 S.Ct. 1080, 84 L.Ed. 1406.

The facts in the *Lehman* case were stipulated by the parties. According to the stipulation, two brothers, Harold M. and Allan S. Lehman, owned equal shares in certain stocks and bonds. Harold agreed to transfer his share in trust for Allen and the latter's issue, in consideration of Allan transferring his share in trust for Harold and Harold's issue, and trusts were created in accordance with

---

* The dissenting opinion of DAVIS, *Judge*, in which NICHOLS, *Judge*, concurs follows the opinion of the Trial Commissioner which has been adopted by the court.

1. When the decedent died on July 15, 1950, the original language of Section 811 (c), as found in 53 Stat. at pp. 120–121, had been amended by Section 7(a) of the Act of October 25, 1949 (63 Stat. 891, 894).

the agreement. The income from the trust property transferred by Harold was to be paid to Allan for his life, with the remainder to Allan's issue, and Allan had the right to withdraw not to exceed $150,-000 of the principal. Similarly, the income from the trust property transferred by Allan was to be paid to Harold for his life, with the remainder to Harold's issue, and Harold had the right to withdraw up to $150,000 of the principal. Harold later died, and the court was called upon to decide whether trust property transferred by Allan was taxable as part of Harold's estate. This question was answered in the affirmative. The court said (109 F.2d at pp. 100–101) that Harold, by transferring his share of the stocks and bonds in trust for the benefit of Allan and the latter's issue, had "paid for and brought about" the transfer by Allan of his share of the stocks and bonds in trust for the benefit of Harold and Harold's issue; and, therefore, that Allan's transfer was in substance a transfer by Harold, so as to make the property so transferred part of Harold's taxable estate.

There are two divergent views of the precise proposition that the *Lehman* case stands for, each espoused in several cases. Since in this case the same result is reached under either view, we have not felt it necessary to choose between the two lines of cases. Each shall be considered in turn.

■ According to one line of cases, the crucial factor in the *Lehman* case was that, under the agreed facts, Harold Lehman had furnished consideration for —i. e., he had "paid for and brought about" the transfer of property by Allan Lehman in trust for the benefit of Harold Lehman and the latter's issue. In re Lueders' Estate, 164 F.2d 128, 133–134 (3d Cir. 1947); Newberry's Estate v. Commissioner of Internal Revenue, 201 F.2d 874, 877, 38 A.L.R.2d 514 (3d Cir. 1953); McLain v. Jarecki, 232 F.2d 211, 213 (7th Cir. 1956); Tobin v. Commissioner of Internal Revenue, 183 F.2d 919 (5th Cir. 1950), cert. denied, 340 U.S. 904, 71 S.Ct. 280, 95 L.Ed. 654. See, also

Estate of Lindsay, 2 T.C. 174 (1943); Guenzel's Estate v. Commissioner of Internal Revenue, 258 F.2d 248 (8th Cir. 1958). In the present case, it becomes necessary, under the rule followed in the above-cited cases, to determine whether the decedent by creating the trust of December 15, 1931, was furnishing consideration for—i. e., whether he was paying for—the subsequent creation of the Janet Grace trust on December 30, 1931. This is a question of fact, which involves an inquiry into the element of motivation. The facts show that when decedent created the Joseph Grace trust, he was not paying for the transfer of the property covered by the Janet Grace trust and that when Janet Grace made such transfers to the Janet Grace trust, she was not induced or caused to do so by reason of the previous establishment of the Joseph Grace trust by the decedent.

Unfortunately, it is necessary to rely largely on circumstantial evidence in making the factual determination that is crucial in the disposition of this case, as both the decedent and Janet Grace were dead at the time of the trial. Consequently, it will be necessary to outline in considerable detail the known facts which appear to be pertinent in drawing inferences with respect to the motivation which led the decedent and Janet Grace to create the trusts of December 15 and 30, 1931.

The decedent and Janet Grace were married in August 1908. Five children, three sons and two daughters, were born to them. One of the daughters died in 1935, but the other four children were living at the time of the trial.

The decedent was a man of great wealth at the time of his marriage to Janet Grace and thereafter. Janet Grace, on the other hand, had no wealth or property of her own at the time of her marriage to the decedent, and she did not thereafter inherit any substantial wealth. However, Janet Grace acquired the ownership of extensive property and financial interests during her marriage to the decedent as the result of transfers which the decedent made to her, either directly

or indirectly. For example, when the decedent on April 5, 1911, paid the purchase price for and acquired a 167-acre farm on Long Island for the purpose of developing it into a homestead for the family, he caused the legal title to be vested in Janet Grace. Thereafter, the decedent proceeded at great expense to convert the acreage into a country estate for use as the family home. The property was called Tullaroan, and it included among the numerous improvements a 65-room colonial-style residence for the family. Tullaroan became the home of the decedent and Janet Grace in about 1911, and it continued to be their home for the remainder of their lives.

There is in the record evidence concerning 24 transfers of property and financial interests by the decedent to Janet Grace during the period between April 19, 1917 and May 10, 1929. One of these transfers involved 3,000 shares of stock in the Ingersoll-Rand Company having a book value of $300,000, and there were 9 additional instances where property having a book value of $100,000 or more was transferred by the decedent to Janet Grace.

The record also contains evidence regarding the creation by the decedent, during the period between August 26, 1920 and June 5, 1930, of 26 trusts for the benefit of his children. While in most instances the properties transferred by the decedent to these various trusts had relatively modest book values, the decedent provided 5 of the trusts with properties having book values in excess of $100,000 for each trust.

In addition, the record contains evidence concerning five instances during the period between August 26, 1920, and March 31, 1929, when Janet Grace made transfers of assets to or for the benefit of the decedent or their children. These incidents involved transfers of properties having book values ranging all the way from $3,860.15 to $613,344.32. It is interesting to note that the largest of these tranfers, which was shown by the record to have been a gift from Janet Grace to the decedent, in effect involved a retransfer by Janet Grace to the decedent of property which the decedent had transferred to her in the first instance. What Janet Grace transferred to the decedent in that instance was stock in a personal holding company which had been set up on behalf of Janet Grace to hold valuable corporate shares which the decedent had previously transferred to Janet Grace.

The decedent exercised supervision and control over, and he made the decisions that were involved in the management of, the business affairs of the family. In performing this function, he made the decisions regarding the management and disposition of the property and financial interests that were in the ownership of Janet Grace. The latter did not concern herself with business matters, but relied on her husband's judgment as to such matters. Janet Grace's time and attention were devoted to her home and to society, music, the theater, the arts, and civic affairs. When the decedent decided that some formal action by Janet Grace was required in connection with the management or disposition of a piece of property or a financial interest that was in her ownership, the decedent customarily would have the appropriate instrument prepared for his wife's signature, and he would then have her execute such instrument. Therefore, although there is no direct evidence, in the record relative to the circumstances that were involved in the transfers of assets by Janet Grace previously mentioned, it is reasonable to infer that such transfers were made by Janet Grace in accordance with plans devised by the decedent.

In managing the business affairs of the family, including the property and financial interests that were in the ownership of Janet Grace, the decedent utilized the services of the Customers' Securities Department of W. R. Grace and Company to assist him by handling the details that were involved in carrying out his decisions.

The events that led directly to the creation by the decedent of the trust dated December 15, 1931, and to the creation of the Janet Grace trust on

December 30, 1931, began in early December of 1931, when the decedent conferred with J. Morden Murphy, head of the Customers' Securities Department of W. R. Grace and Company, concerning the creation of additional trusts by the decedent and Janet Grace. The decedent believed that a new gift tax would probably be enacted and become effective early in 1932, and he had decided that additional trusts for the benefit of the family should be created prior to the close of 1931 in order to avoid paying the new gift tax in connection with transfers of assets to such trusts. Mr. Murphy furnished to the decedent balance sheets that were maintained for the decedent and Janet Grace, showing the capital assets in their respective ownerships. The decedent, in consultation with Mr. Murphy, selected the various properties in his ownership and in the ownership of Janet Grace that should be included in the trusts that were to be created by the decedent and Janet Grace. At the time of the conference with Mr. Murphy, the decedent had in his possession drafts of trust instruments that were to be executed by the decedent and Janet Grace, except for the listing of the properties that were to be included in the respective trusts.

Following the conference mentioned in the preceding paragraph, and in accordance with the plan devised by the decedent, he executed on December 15, 1931, a trust instrument which created a trust that will be referred to hereafter in the opinion as "the Joseph Grace trust." William R. Grace, William G. Holloway, and the decedent himself were named in the instrument as trustees of the Joseph Grace trust. The trustees were directed to pay the income from the trust to Janet Grace during her lifetime, and also to pay to her any amounts of the principal which a majority of the trustees might deem advisable. Janet Grace was given the power to designate, by will or deed, the manner in which the trust estate remaining at the time of her death should be distributed to or for the benefit of the decedent and their children.

In connection with the execution of the trust instrument on December 15, 1931, the decedent transferred to the Joseph Grace trust blocks of the capital stock of three corporations, several parcels of real estate, and a one-fourth undivided interest in a certain joint venture which, at the time, owned a tract of land, a number of real estate mortgages, other receivables, cash, and 10,620 shares of common stock in the Ingersoll-Rand Company.

Fifteen days after the creation of the Joseph Grace trust by the decedent, Janet Grace on December 30, 1931, acting in accordance with the plan of the decedent previously mentioned, executed the trust instrument which created the Janet Grace trust. William R. Grace, William G. Holloway, and Janet Grace were named as the trustees of the Janet Grace trust. Under the provisions of this trust, the trustees were to pay the income from the trust property to the decedent during his lifetime, together with any amounts of the principal which a majority of the trustees might deem advisable. Also, the trust instrument directed that, during the life of the decedent, he should be entitled to the use and occupancy of the real property that was included in the trust.

In connection with the execution of the trust instrument referred to in the preceding paragraph, Janet Grace on December 30, 1931, transferred to the Janet Grace trust the family homestead, Tullaroan, and 40 shares of stock in a corporation known as Lundy's Lane Corporation. That corporation was a personal holding company which had been incorporated on behalf of Janet Grace on November 9, 1923. At that time, she received 607 shares of Lundy's Lane stock in exchange for 12,000 shares of Ingersoll-Rand Company stock, 3,600 shares of W. R. Grace and Company common stock, and 3,040 shares of W. R. Grace and Company preferred stock, all of which had been received by Janet Grace as gifts from the decedent at various times during the years 1917, 1918, 1919, and 1922. Of the 607 shares

of stock in Lundy's Lane Corporation originally owned by Janet Grace, she made a gift of 200 shares to the decedent on March 31, 1929, and the decedent in turn made gifts totaling 100 shares to trusts for his five children (20 shares each) on April 4, 1930. After the creation of the Janet Grace trust on December 30, 1931, Janet Grace continued to own 367 shares of stock in Lundy's Lane Corporation, the decedent owned 100 shares, the Janet Grace trust owned 40 shares, and the five trusts previously created by the decedent for the benefit of his children owned 20 shares each.

The pattern of creating trusts for the benefit of members of the family, and of transferring assets directly to members of the family, continued during the years that followed the creation of the Joseph Grace trust and the Janet Grace trust in December of 1931. Both the decedent and Janet Grace were involved in such actions.

Janet Grace died on December 31, 1937, at the age of 53 years. The Joseph Grace trust terminated with the death of Janet Grace. The estate of Janet Grace filed a Federal estate tax return in which the Janet Grace trust was disclosed and reported as a nontaxable transfer by Janet Grace. Following an examination of the return by the Internal Revenue Service, the IRS asserted a deficiency on the ground that the Joseph Grace trust and the Janet Grace trust were reciprocal. Negotiations were then conducted between representatives of the Internal Revenue Service and representatives of the estate of Janet Grace. During the course of these negotiations, the representatives of the estate countered the contention of the Internal Revenue Service by contending that the gross estate should be adjusted by reductions in the values, as shown on the return, of certain blocks of corporate stock owned by Janet Grace at the date of her death, and by elimination from the assets shown on the return as Janet Grace's property of certain household effects which (according to representatives of the estate) belonged to the decedent. As a result of the negotiations, the Internal Revenue Service and the estate of Janet Grace entered into a compromise agreement whereby 55 percent of the total appraised value of the corpus of the Janet Grace trust at the time of her death was included in her taxable estate, and the estate of Janet Grace abandoned its counter-contentions.

In discussing the issue as to the reciprocity of the Janet Grace trust and the Joseph Grace trust, as indicated in the preceding paragraph, the negotiators believed that the value of the Janet Grace trust was less than the value of the Joseph Grace trust, and that if the doctrine of reciprocal trusts were applicable, it would be the value of the lesser trust (i. e., the Janet Grace trust) that would be taxable as part of the estate of Janet Grace.

The decedent died on July 15, 1950, at the age of 73 years. A Federal estate tax return was filed on behalf of the decedent's estate. In this return, the transfers of assets by the decedent to the Joseph Grace trust were disclosed as transfers not includible in the decedent's gross estate, and the Janet Grace trust was reported as a trust under which the decedent held a limited power of appointment. Neither trust was included in the taxable gross estate of the decedent.

Following an examination of the return referred to in the preceding paragraph, the Internal Revenue Service (in addition to several relatively minor adjustments that are not involved in this litigation) added to the decedent's gross estate the sum of $1,116,888.62, with the following explanation:

Represents reciprocal trust made by decedent's wife, Janet, on Dec. 31 [sic], 1931, for the benefit of decedent. Includible in the gross estate under Section 811(c) of the Internal Revenue Code. A full explanation of this adjustment was given to the estate representatives.

On the basis of this adjustment (and others that are not involved in this litigation), the Internal Revenue Service

assessed an estate tax deficiency in the net amount of $363,500.97 against the decedent's estate. This deficiency, plus assessed interest in the amount of $55,-720.08, was paid by the decedent's estate on July 14, 1954.

A claim for refund was subsequently filed with the Internal Revenue Service on behalf of the decedent's estate. Administrative relief was not obtained, and the present action followed.

A very significant fact in connection with the creation of the Joseph Grace trust and the Janet Grace trust was that, as inferred from the evidence in the whole record, neither the decedent nor Janet Grace had any desire to acquire property from the other. Instead, the motivation behind the creation of these trusts was the desire of the decedent to effect transfers of assets among, and for the benefit of, members of the family with a minimum of gift-tax consequences. These transfers were part of a well-established pattern of conduct, managed by the decedent, which began as early as 1911, which continued for many years, and which involved numerous transfers of valuable property and financial interests among the members of the family.

It is certainly obvious that the decedent, when he created the Joseph Grace trust on December 15, 1931, was not motivated by any intention to give consideration for, or pay for, the transfer of Tullaroan by Janet Grace to the Janet Grace trust on December 30, 1931, in order that he might obtain the right to the use and enjoyment of the family homestead. As previously indicated, Tullaroan had been the family homestead since about 1911. The decedent had paid the original purchase price for Tullaroan, although the title had been taken in the name of Janet Grace, and the decedent had subsequently provided the funds that were required for the construction of the buildings and other improvements in developing Tullaroan into a country estate (except that an uncle of the decedent bore the cost of making certain additions to the main residence in about 1920). At the time of the

creation of the Joseph Grace trust and the Janet Grace trust, there was no indication that either Janet Grace or the decedent ever expected to leave Tullaroan during their lives; and, in fact, they both continued to live there until they died. There was no change whatever in the use and enjoyment of the homestead by the decedent, Janet Grace, and their children as a result of the transfer of the legal title from Janet Grace to the trustees of the Janet Grace trust. Consequently, there is no basis in the record for a finding that the decedent created the Joseph Grace trust and transferred property to it in order to induce Janet Grace to transfer Tullaroan to the Janet Grace trust so that the decedent might obtain the right to the use and enjoyment of the family homestead.

It would also be unrealistic to find that the decedent, in creating the Josph Grace trust on December 15, 1931, intended to furnish consideration for, or pay for, the transfer by Janet Grace of the 40 shares of stock in Lundy's Lane Corporation to the Janet Grace trust. That corporation was a personal holding company that had been established on behalf of Janet Grace to hold valuable shares of corporate stock which the decedent himself had previously given to Janet Grace. Actually, as stated heretofore, the inference to be drawn from the whole record is that the decedent, when he created the Joseph Grace trust and transferred property to it, was not motivated by a desire to obtain any sort of property, or interest in property, from Janet Grace. Rather, he was merely continuing a long-established pattern of conduct, and the immediate motivation was a desire to effect transfers of assets among members of the family before an expected new gift tax became effective.

Conversely, there is no basis in the record for a finding that Janet Grace, in transferring Tullaroan and 40 shares of stock in Lundy's Lane Corporation to the Janet Grace trust, was influenced in any way by the circumstance that the decedent had previously created the Jo-

seph Grace trust. Indeed, there is no evidence in the record that Janet Grace even knew about the creation of the Joseph Grace trust by the decedent. Cf. Hanauer's Estate v. Commissioner of Internal Revenue, 149 F.2d 857, 859 (2d Cir., 1945), cert. denied 326 U.S. 770, 66 S.Ct. 175, 90 L.Ed. 465. On the basis of the whole record, it is reasonable to infer that Janet Grace executed the instrument creating the Janet Grace trust, and that she transferred property to that trust, merely because the decedent requested that she do so; and that if any explanation at all was given to Janet Grace by the decedent, it was merely to the effect that a probable saving in gift tax could be effected if such actions were taken by Janet Grace before the end of 1931.

However, there remains for consideration a separate line of cases which apply different legal standards in determining the existence of consideration within the meaning of the *Lehman* case. These cases vary somewhat in the statement of the rule, but basically they look at the objective evidence to determine whether trusts created by husband and wife similar to those involved in this case are reciprocal and taxable. In some of these cases, consideration is inferred from the fact that the properties included in the two trusts are of approximately the same amount, that the trusts are created at or about the same time, and that each grantor gives the other a life estate in income, so that the trust would normally be included in his estate if the grantor had reserved that power to himself. Cole's Estate v. Commissioner of Internal Revenue, 140 F.2d 636, 151 A.L.R. 1139 (8th Cir. 1944). Other cases in this group hold that the same inference will be made unless rebutted by clear evidence. Hanauer's Estate v. Commissioner of Internal Revenue, 149 F.2d 857 (2d Cir. 1945), cert. denied, 326 U.S. 770, 66 S. Ct. 175, 90 L.Ed. 465; Orvis v. Higgins, 180 F.2d 537 (2d Cir. 1950), cert. denied, 340 U.S. 810, 71 S.Ct. 37, 95 L.Ed. 595. In still others, the presence or absence of a motive to avoid the payment of estate taxes has been an important factor in deciding the application of the "reciprocal trust" doctrine. Estate of Louis D. Ruxton, 20 T.C. 487 (1953). The additional evidence heard at the second trial in this case and the facts found therefrom do not change the result when the rule announced in the above-cited cases is applied here.

It appears from the evidence in the augmented record that Joseph P. Grace never said or did anything which would indicate or imply that he was motivated by the desire to avoid or lessen estate taxes when he created the Joseph Grace trust on December 15, 1931 and caused his wife to create the Janet Grace trust on December 30, 1931. The evidence also establishes the existence of other logical and even compelling motives for these transactions.

It is true that there is a great deal of evidence in the record, as supplemented in July 1966, about a plan which was being promoted during the period 1930–1931 by Alan Ross, of the Grace National Bank's Trust Department, which involved the creation of trusts by a husband and wife for the benefit of each other, and which had, as one of its supposed advantages, the possibility of ultimately minimizing estate taxes. At that time, both the Grace National Bank and W. R. Grace and Company were controlled by the Grace family, of which Joseph P. Grace was generally considered to be the head. The two companies occupied the same building in New York City, and Joseph P. Grace maintained his office in that building.

Alan Ross was very active during the period 1930–1931 in attempting to generate and obtain trust business for the Grace National Bank. He approached many people with respect to the desirability of creating trusts and naming the Grace National Bank as trustee. As one of his promotional activities, Mr. Ross endeavored to interest wealthy married couples of his acquaintance in a plan whereby a husband and wife would each set up a trust for the benefit of

the other, each spouse receiving the income for life from the trust created for his or her benefit by the other spouse, and then, upon the death of a spouse-beneficiary, the property in the particular trust would pass to the children of the couple. One of the advantages of his plan, according to Mr. Ross, was that it provided a means whereby a husband and wife could equalize the family income between them and thus effect annual savings in income taxes. Mr. Ross also asserted that his plan could be utilized to minimize estate taxes upon the deaths of the spouses, provided an adequate period of time—and Mr. Ross suggested at least a year—were permitted to elapse between the creation of the two trusts, so as to avoid a subsequent inference by the taxing authorities that the two trusts were created for the specific purpose of avoiding estate taxes.

Details concerning the Ross plan, and regarding Mr. Ross' efforts to interest various persons in the plan, are set out in the additional findings 37–41.

Alan Ross never discussed the creation of trusts with Joseph P. Grace. However, in some manner that is not shown by the evidence, Mr. Grace learned of Alan Ross' plan relative to the creation of trusts by a husband and wife for the benefit of each other. Sometime in 1931, Mr. Grace asked Harold J. Roig what the latter thought about the Ross plan. Mr. Roig had formerly been head of the Legal Department of W. R. Grace and Company, was then an official of that company, and occupied an intimate and confidential relationship with Joseph P. Grace. Mr. Grace did not indicate that he was considering the creation of such trusts, and Mr. Roig did not understand that Mr. Grace was consulting him for legal advice. Mr. Roig responded to Mr. Grace's inquiry by indicating that he had not done any legal research on the plan, but that it was his "curbstone" opinion that Mr. Ross' plan would not be advantageous in so far as any prospective savings in estate taxes were concerned.

That Joseph P. Grace, in connection with the creation of the Joseph Grace trust and the Janet Grace trust in December 1931, was not attempting to carry out the Ross plan to minimize estate taxes is indicated by the circumstances that Mr. Grace created the Joseph Grace trust on December 15 and caused Mrs. Grace to create the Janet Grace trust 15 days later, or on December 30, 1931, whereas an essential part of the Ross plan to lessen estate taxes was the lapse of a considerable period of time between the creation of trusts by a husband and wife.

Perhaps specific reference should be made to the circumstances that, as indicated in additional finding 46, Joseph P. Grace was aware of the contention made by the Internal Revenue Service after the death of Janet Grace that the Joseph Grace trust and the Janet Grace trust were reciprocal and one of the trusts was includable as part of the taxable estate of Janet Grace; that Mr. Grace preferred not to litigate the issue; and that he instructed counsel for the estate of Janet Grace to go ahead and make the best settlement with the Internal Revenue Service that was possible. Subsequently, a compromise agreement was entered into between the Internal Revenue Service and the estate of Janet Grace whereby 55 percent of the total appraised value of the corpus of the Janet Grace trust at the time of her death was included in her taxable estate. However, Mr. Grace's willingness to compromise a disputed claim cannot properly be regarded as an admission by him that the Internal Revenue Service was correct in its contention that the two trusts were reciprocal. 4 Wigmore, Evidence § 1061(c) (1940).

The reasonable inference to be drawn from the record as a whole is that Joseph P. Grace was not motivated by a purpose to minimize taxes of any kind in originally deciding to create the Joseph Grace trust and to have his wife create the Janet Grace trust, although Mr. Grace did indicate that, from the standpoint of timing, he desired that the

creation of the trusts be accomplished promptly, in December 1931, because it was his view that a gift tax was "coming along any day now."

■ Therefore, if we take the view of those cases which impose the burden on the taxpayer to rebut any inference arising under the circumstances of this case that the Janet Grace trust was created in consideration of the trust previously established by the decedent, we think the burden has been met. It has been shown that the two trusts were not created to avoid estate taxes but merely as another step in a long-established pattern of family giving. Thus, since it has been shown that there was substance to the transactions and that they were not merely shams to avoid the imposition of estate taxes, the Janet Grace trust should not be included in the estate of the decedent. Accordingly, plaintiffs are entitled to recover, with the amount of the recovery to be determined pursuant to Rule 47(c).

DAVIS, Judge (dissenting):

### I.

1. Even on the court's own assumption that subjective motivation is all-controlling, the judgment should go for the Government. Under the rule of the first "line of cases" (as formulated in the majority opinion), I cannot escape the conclusion that Mr. and Mrs. Grace did give "consideration" to each other in the sense that the establishment of each trust was the *quid pro quo* for the other, and was intended as such. There

is, first of all, the basic finding, adopted by the court, that the trusts "were created by, or at the instigation of, Joseph P. Grace as parts of what was essentially a single transaction." Finding 53. This is far from an overstatement. The decedent was the sole decision-maker in the household; his wife accepted his choices without question, even for her property. Finding 5(a). The creation of two trusts in December 1931 followed this pattern (findings 10 and 45), and there is no possibility that Janet Grace was pursuing an independent course. The two trusts, moreover, were obviously inter-connected; Joseph developed the idea of both at the same time, he had his attorney draw them up simultaneously (findings 10 and 45), the instruments contained very similar provisions and were the same in form (findings 11(a), 12(a), and 13), they were both executed within a short period of time, and both covered substantial properties (findings 11 and 12).[1]

It follows in common sense, as I gauge it, that one of these inter-related trusts was in exchange for the other, one settlor was actually "paying for" the transfer made by the other. Of course, the Graces did not desire to acquire property from one another (finding 15) but neither did the Lehman brothers in the seminal decision and neither do the parties to any reciprocal trust arrangement. That is almost an irrelevant factor since the mutuality is all-important to the parties, not the property content of the individual transfers if they were isolated. Of course, Mrs. Grace as a person was

[1] See also the evidence referred to infra as to the decedent's probable tax motivation and the departure from the type of gifts the Graces had been making in the past or would make in the future.

The findings that the trust instruments were signed 15 days apart (findings 11(a) and 12(a)) and that no attempt was made to equalize the value of the trust corpora (finding 45(g)) do not swing the balance the other way. The latter would be pertinent for transfers between spouses only in very special circumstances since the distribution of assets between husband and wife is rarely of great conse-

quence and spouses infrequently deal with each other at arm's length. Compare Estate of Ruxton, 20 T.C. 487, 494 (1953), with Cole's Estate v. Commissioner of Internal Revenue, 140 F.2d 636, 638, 151 A.L.R. 1139 (C.A. 8, 1944). The first is insignificant in light of the finding that the instruments were drafted at about the same time. See Orvis v. Higgins, 180 F.2d 537 (C.A. 2), cert. denied, 340 U.S. 810, 71 S.Ct. 37, 95 L.Ed. 595 (1950) (6 day gap); Estate of Carter, 31 T.C. 1148, 1151–1153 (1959) (1 day); Estate of Eckhardt, 5 T.C. 673, 678–679 (1945) (6 days).

not induced or caused to establish her trust by the previous establishment of Joseph's trust. See finding 12(e). But he was her agent and acted for her in this as in all financial transactions—and *he* obviously wanted the trusts to be related, connected, and interdependent. Since Joseph was the only real moving party and Janet was wholly acquiescent, it is immaterial that there is no evidence of a factual "bargain" between them (see finding 30), or even a tacit understanding (finding 29), and that, quite likely, Janet Grace had no knowledge of her husband's trust (finding 12(e)). It cannot be that the law frees from estate tax a reciprocal trust arrangement where, as here, the wife is the submissive instrument of her husband, while imposing the levy where the wife is a sovereign soul who, though making up her own mind, agrees with her spouse to adopt the cross-trust device. Gentlemen with compliant Biancas at their side instead of independent Katherines may enjoy some advantages, but certainly not that one.

2. A separate line of cases, in the court's view, stresses tax avoidance, but the court concludes that "the reasonable inference to be drawn from the record as a whole is that Joseph P. Grace was not motivated by a purpose to minimize taxes of any kind in originally deciding to create the Joseph Grace and to have his wife create the Janet Grace trust * * *." My judgment, to the contrary, is that the taxpayers have failed to bear their burden of proving the absence of estate tax motivation.[2]

The majority concludes that this motive is negated, in the main, by the facts that Joseph Grace desired to avoid the impending gift tax (findings 10 and 15), and that the Graces had a longstanding practice of intra-family donations (findings 7–9 and 16–17), including a great number of trusts (finding 32). However, the wish to by-pass the gift tax

is by no means inconsistent with a desire to avoid the estate tax as well, especially when, as is conceded, both trusts were deliberately part of a single undertaking. Cf. Orvis v. Higgins, supra, 180 F.2d 537, reversing 80 F.Supp. 64, 72, 74 (S.D.N.Y.1948); Estate of Carter, supra, 31 T.C. at 1152. Nor does the history of intra-family generosity and the decedent's "trust-mindedness" support the conclusion. This pattern does not include, so far as the findings show, a single reserved life estate to the other spouse, much less cross-life-estates, in property transferred to the children; nor does it show that the Graces had ever made simultaneous transfers to one another. The uniqueness of these two December 1931 transfers suggests strongly that they were linked to each other, not to any *post* or *ante* family practice, and that they had a special purpose. Cf. Estate of Carter, supra, 31 T.C. at 1154. No non-tax reason has been given us why, in this instance, the Grace pattern of generosity to kin worked itself out through this unusual mechanism of interdependent cross-trusts—and I can think of none.

True, there is no direct evidence that the decedent actually had tax avoidance in mind. We do know, however, that he thought and talked about the supposed tax advantages of concurrent trust transfers between spouses. Alan Ross, an executive in the Trust Department of the Grace National Bank, was an advocate of reciprocal trusts as a mode of minimizing estate taxes (findings 36 and 37(c)); though Joseph Grace was not proved to have had direct contact with Ross on this subject, he was aware of the Ross plan and discussed it with Harold J. Roig, an executive of W. R. Grace and Company and a confidant of Joseph's (Roig recommended against it) (findings 39 and 44); various Grace business executives and friends or relatives of the decedent either knew of and talked about the idea or had been approached by Ross

---

**2.** The estate has the task of showing that it is entitled to recover under the governing rules. See Orvis v. Higgins, supra,

180 F.2d at 541; Estate of Eckhardt, supra, 5 T.C. at 680; Estate of Lindsay, 2 T.C. 174, 177 (1943).

to execute such trusts (findings 38–42) ;[3] contrary to decedent's custom, he presented J. Morden Murphy (who handled most of the Grace family's financial affairs) with a prepared draft of the Joseph Grace trust and possibly the Janet Grace trust for use as models (findings 35 and 45(f)) ; these drafts were very similar to the cross-trust instruments drawn by Alan Ross for D. Stewart Iglehart, a personal friend of Joseph Grace and president of W. R. Grace and Company (findings 41, 42, and 45(f)) (see footnote 3). In addition, although this is not included in the findings, the draft trust instrument which Joseph brought with him, unlike any previously executed by him, designated the Grace National Bank as a trustee and—significantly—was prepared for the signature of Alan Ross on behalf of the bank.

This clear nexus between Joseph and the Ross tax-avoidance device—together with the lack of any other plausible reason for the cross-life-estates and their uniqueness in the Grace annals—persuade me of the probability that the decedent's actions had a distinct estate tax coloration. At a minimum, the plaintiffs have not succeeded, for me, in their job of persuasion.

## II.

1. But the most damaging crack in the foundation of the court's opinion comes from its hydraulic stress on subjective motivation far beyond its proper weight. Even though the trusts were admittedly part of one transaction, the court still seeks to find whether the settlors actually intended to induce each other to enter into the arrangement and to "pay for" the other's transfer, whether they actually intended to lessen estate taxes, and whether they were actually dominated by other motives. "Putting the wrong question is not likely to beget right answers even in law." Vanston Bondholders Protective Committee v. Green, 329 U.S. 156, 170, 67 S.Ct. 237, 243, 91 L.Ed. 162 (1946) (Frankfurter, J., concurring). As I understand the reciprocal trust doctrine stemming from Lehman v. Commissioner of Internal Revenue, 109 F.2d 99 (C.A. 2), cert. denied, 310 U.S. 637, 60 S.Ct. 1080, 84 L.Ed. 1406 (1940), the correct question— once the cross-trusts are seen as interdependent (as has been found here)—is whether the trusts created by the two settlors put both in approximately the same economic position, objectively, as they would have been in if each had created his own trust without invoking or using the other as beneficiary. See Lowndes, Consideration and the Federal Estate and Gift Taxes: Transfer for Partial Consideration, Relinquishment of Marital Rights, Family Annuities, the Widow's Election, and Reciprocal Trusts, 35 Geo.Wash.L.Rev. 50, 80 (1966). The essential purpose is to prevent a reciprocal arrangement from canceling the effect of an ostensibly complete *inter vivos* conveyance which on its face severs the settlor completely from the transferred assets.[4]

3. Among those whom Ross tried to convert were Harold J. Roig (finding 39); W. R. Grace, brother of Joseph and a trustee for each of the Grace trusts involved here (finding 40) ; and D. S. Iglehart, president of the Grace company and a long-time friend of the decedent (finding 41). Apparently, of these, only Iglehart was inclined to follow Ross' plan. Findings 39–41. Although he did not hew to every aspect of the idea, the evidence supports the conclusion that he hoped to save some estate taxes when he and his wife executed the trust instruments drawn by Ross. The scheme was also a topic of discussion among the personnel of the Customer Securities Department (J. Morden Murphy and A. S. Rupley) and of the Legal Department (H. N. Deyo, A. B. Shea, and Cogswell). Finding 38. Finally, the record indicates that W. G. Holloway, a nephew of the decedent and a trustee on both trusts, knew of the plan although it is not clear whether he was fully aware of the estate tax implications.

4. The background of reciprocal trusts is discussed in Colgan & Molloy, Converse Trusts—The Rise and Fall of a Tax Avoidance Device, 3 Tax L.Rev. 271 (1948). Congress has, in effect, approved the doctrine's effort to close the loophole. In the Technical Changes Act

The estate tax is, of course, designed to tax transfers of property made at death. Congress recognized, however, that such an impost could not be effective unless there were some restrictions on *inter vivos* transfers. Through Section 811 it sought to "include in the gross estate *inter vivos* gifts 'which may be resorted to, as a substitute for a will, in making disposition of property operative at death.'" Helvering v. Hallock, 309 U.S. 106, 114, 60 S.Ct. 444, 449, 84 L.Ed. 604 (1940). We have been taught by Estate of Spiegel v. Commissioner of Internal Revenue, 335 U.S. 701, 69 S.Ct. 301, 93 L.Ed. 330 (1949), that—once a "transfer" is shown—the critical test is the objective situation, not whether the decedent in his own mind resorted to the *inter vivos* transfer as a means of testamentary disposition.

In *Spiegel* the Court held, *inter alia*, that taxability under Section 811(c) (1) (C) "does not hinge on a settlor's motives, but depends upon the nature and the effect of the trust transfer." It is "immaterial" whether the interest upon which inclusion is premised "remains in the grantor because he deliberately reserves it or because, without considering the consequences, he conveys less than all of his property ownership." Any other approach, "such as a post-death attempt to probe the settlor's thoughts in regard to the transfer, would partially impair the effectiveness of the * * * provision as an instrument to frustrate tax evasions." 335 U.S. at 705–706, 69 S.Ct. at 302–303. Although the Court was applying Section 811(c) (1) (C) (transfers "intended to take effect in possession or enjoyment" at the trans-

feror's death), its reasoning applies with at least equal force to Section 811(c) (1) (B), involved here, which is framed in still more objective terms.[5]

If taxability turns on states of mind, the "difficulty of searching the motives and purposes of one who is dead" is likely to render estate taxes on *inter vivos* transfers "a weak and ineffective means of compensating for * * * the withdrawal of vast amounts of property from the operation of the estate tax." Heiner v. Donnan, 285 U.S. 312, 343, 52 S.Ct. 358, 367, 76 L.Ed. 772 (1932) (Stone, J., dissenting); see Bittker, The Church and Spiegel Cases: Section 811(c) Gets a New Lease on Life, 58 Yale L.J. 825, 835–837 (1949). In addition, family arrangements which appear entirely comparable in their actual impact will receive different tax treatment dependent on amorphous testimony as to states of mind.

Avoidance of this danger by not inquiring into motives is more strongly justified when the truly non-tax reasons for a particular form of arrangement are rare, at best. Cross-trusts which are shown to be truly reciprocal definitely have this characteristic. Originally developed by enterprising attorneys during the 1930's as a tax avoidance device, nothing in their history indicates that they were engineered to fulfill any other function. See note 4 supra. Focusing on the beneficial interest or power granted to a decedent, one is hard put to find a purpose other than tax avoidance or, if the decedent was not fully aware of the tax implications, the aim of achieving some substitute for a will in disposing of property at death—to give the

of 1949, ch. 720, § 6, 63 Stat. 891, 893–94, it permitted those who had used the device prior to 1940 to give up their control over a reciprocal trust without paying a gift tax on the relinquishment. The Senate Finance Committee noted that, prior to *Lehman*, the device had been used "with the apparent intent of minimizing estate taxes" and that *Lehman* "put taxpayers on notice as to the probable tax consequences of reciprocal trusts in the future." S.Rep.No. 831, 81st

Cong., 1st Sess., at 5–6 (1949), reprinted in 1949–2 Cum.Bull. 289, 292.

5. Even as to the word "intended", the Court pointed out in Commissioner of Internal Revenue v. Estate of Church, 335 U.S. 632, 638, 69 S.Ct. 322, 325, 93 L.Ed. 288 (1949), that the historic test of "'intended' was not a subjective one, * * * the question was not what the parties intended to do, but what the transaction actually effected as to title, possession and enjoyment."

property at life's end but to keep a grasp on it while life lasts. See Orvis v. Higgins, supra, 180 F.2d at 540–541; Estate of Carter, supra, 31 T.C. at 1153–1154; McLain v. Jarecki, 232 F.2d 211, 213–214 (C.A. 7, 1956) (dissenting opinion). The short of it is that, first, the obstacles to a fair determination of the actual subjective intent of the decedent are many and heavy; second, there is the highest probability that, by an interdependent reciprocal-trust arrangement, a decedent desires to avoid estate taxes or at least to achieve the type of transfer the estate tax is designed to assess (postponement until the transferor's death of relinquishment of his right to possess and enjoy the property); and, finally, in the remote instance in which the decedent has some other curious purpose, the objective fact, whether he knows or desires it or not, is that he is tieing a string to the very property he purports to give completely away.[6]

2. This objective standard comes into play only after it is found that the cross-trusts are truly reciprocal, connected, interdependent; and in making the latter determination subjective intent does have its role. Clearly the estate tax permits a person during his lifetime to rid himself of property, and it also allows him to receive a beneficial interest in or power over the trust of another without necessarily having the corpus included in his estate. There is no doubt that this is true even if the chance effect of such independent transfers is to leave

him in the exact situation he would have been in had he transferred his property retaining an interest or power similar to that granted by his benefactor. We can borrow an illustration from O. Henry's "Gift of the Magi", transforming it in milieu and feeling-tone. Suppose Janet Grace were a self-reliant woman and, consulting her own attorneys and advisers, independently and secretly decided to make a Christmas present to Joseph and her children in December 1931 by setting up the Janet Grace trust. Moved in the same way and unaware of Janet's plan, Joseph also decided, secretly, to make that kind of holiday gift to his family by establishing the Joseph Grace trust. On Christmas morning, the two executed trusts would appear to an outsider to be reciprocal and interdependent, but from the background we would know that that was not so. The appearance would mask the reality.

In the technical terms of the statute (§ 811(c) (1) (B)) the inquiry into true reciprocity and interdependence assesses whether the decedent made a "transfer", even though he was not the nominal settlor. If the cross-trust arrangement was mutual and interdependent, there is such a "transfer"; if the crossing of the trusts was haphazard, not pre-arranged, not part of a plan, there is no "transfer". To that extent the background of the transaction, including subjective motives, is relevant. Motivation is used to determine the link between the trusts, and not, as a separate question, what the parties

6. In *Spiegel* the Court held that an infinitesimal reversionary interest arising by operation of state law was enough to bring the transferred property within the decedent's gross estate under the portion of Section 811(c) covering transfers "intended to take effect in possession or enjoyment" at death. Shortly afterwards, Congress repudiated this particular result when applied to transfers made before October 8, 1949, by requiring (1) that the reversionary interest be expressly reserved in the trust instrument and (2) that the value of the interest exceed 5 per cent of the value of the property transferred. See Technical Changes Act of 1949, ch. 720, § 7(a), 63 Stat. 891, 895, as amended by Technical Changes Act of 1953, ch. 512, § 207, 67 Stat. 615, 623. However, there is no indication that Congress, even through this express-reservation requirement, meant to make the transferor's subjective intent a crucial factor for taxation. See Bittker, Church and Spiegel. The Legislative Sequel, 59 Yale L.J. 395, 410 (1950). But cf. Estate of Marshall, 16 T.C. 918, 921–923 (1951), aff'd, 203 F.2d 534 (C.A. 3, 1953). As for transfers after October 7, 1949, the statutes do not require that the reversionary interest be specifically reserved. See Int.Rev.Code of 1954, § 2037(a) (2); Technical Changes Act of 1949, supra, § 7(a).

hoped or wanted to accomplish from their plan. The interdependence, in and of itself, furnishes the only "consideration" which the reciprocal trust doctrine should demand.

In the present case the findings and record show that the crossing was not haphazard but part of a single, interdependent transaction. See Part I of this opinion, supra. Accordingly there was a "transfer" by Joseph of the assets of the Janet trust, just as there was a "transfer" by Janet of the property in the Joseph trust. Those mutual transfers left Joseph, up to the limits of his wife's trust, in the same position as if he had given himself, rather than his wife, the life interest under the Joseph trust. If he had done that directly, the tax would admittedly be due under § 811(c) (1) (B), no matter what his subjective motivation for creating the life interest. The estate should not escape because the same result came in more roundabout fashion. There is no need to delve further into Joseph Grace's intentions or motives.

3. This analysis is, I believe, consistent with the results, though not with all the language in a few of the opinions, in the estate tax reciprocal-trust cases of which we are aware.[7] The basic rationale of many, probably most, of the decisions is affirmatively in accord. Included are those cases emphasizing interdependence and, once that is found, holding the tax due without much more in the way of facts.[8] Quite explicit are Cole's Estate v. Commissioner of Internal Revenue, supra, 140 F.2d 636, and Hanauer's Estate v. Commissioner of Internal Reve-

nue, supra, 149 F.2d 857. *Cole's Estate* upheld a Tax Court decision "based upon the legal effect of the trust agreements coupled" with the finding that " 'the property of the wife was in effect exchanged for that of the husband.' " 140 F.2d at 637, 638. It further held that " 'with few exceptions the law attaches legal consequences to what the parties do quite independently of their private purpose or intent.' " 140 F.2d at 638. Similarly, *Hanauer's Estate*, supra, concluded that "the two trust indentures were contemporaneously developed and executed as though all part of a single transaction" and that, "[t]here being no contention that the decedent's transfer was one in contemplation of death, his motive was not controlling." 149 F.2d at 859.

The few opinions which seem to insist, in part, on a conscious, subjective bargain-and-exchange seem to rest on a determination that the crossed trusts were not in fact interdependent. In Newberry's Estate v. Commissioner of Internal Revenue, 201 F.2d 874, 875 (C.A. 3, 1953), the husband gave unrebutted testimony "that he would have created his trusts regardless of whether Mrs. Newberry had decided upon a similar course." The trusts were created fifteen months apart in In re Leuders' Estate, 164 F.2d 128, 132 (C.A. 3, 1947), and there was very little indication of interdependence. McLain v. Jarecki, 232 F.2d 211, 213 (C.A. 7, 1956), is not so clear, but the court seems to have treated the "donative state of mind once extant" between the spouses as showing that each was pursuing an independent course.[9] The decisions are thus distinguishable, but to

7. I do not discuss the non-estate tax cases, which often present complicating problems.

8. See Estate of Moreno v. Commissioner of Internal Revenue, 260 F.2d 389, 392 (C.A. 8, 1958); Orvis v. Higgins, supra, 180 F.2d at 540; Hanauer's Estate v. Commissioner of Internal Revenue, 149 F.2d 857, 858 (C.A. 2), cert. denied, 326 U.S. 770, 66 S.Ct. 175, 90 L.Ed. 465 (1945); Estate of Carter, supra, 31 T. C. at 1154; Estate of Newberry, 6 T.C. M. 455 (1947), aff'd per curiam, 172 F. 2d 220 (C.A. 3, 1948); Estate of.Eck-

hardt, supra, 5 T.C. at 680, 682; Estate of Fish, 45 B.T.A. 120, 125 (1945); cf. Blackman v. United States, 48 F.Supp. 362, 368, 98 Ct.Cl. 413, 426–427 (1943). Compare Estate of Ruxton, supra, 20 T. C. at 494; Estate of Resch, 20 T.C. 171, 183 (1953); Estate of Lindsay, supra, 2 T.C. at 177, 179.

9. Estate of Guenzel v. Commissioner of Internal Revenue, 258 F.2d 248, 252, 254 (C.A. 8, 1958), contains dicta suggesting the bargain-and-exchange approach, but also quotes the broader formulation of *Cole's Estate*, supra.

the extent the opinions reflect adherence to the narrow view that an actual subjective bargain is necessary, I would reject them as contrary to the aims of the estate tax provisions on *inter vivos* transfers and out of harmony with the bulk of the jurisprudence on this point.

For these reasons I dissent and would hold that the taxpayers are not entitled to recover.

NICHOLS, Judge, joins the foregoing dissenting opinion.

## Findings of Fact

1. This case is a suit for refund of Federal estate taxes and interest thereon paid by the Estate of Joseph P. Grace, Deceased.

2. Joseph P. Grace, the decedent whose estate is here involved (hereinafter sometimes called "the decedent"), and Janet Grace were husband and wife. They were married in August 1908.

3. (a) The following children, born on the dates indicated, are the surviving offspring of the marriage of the decedent and Janet Grace:

> Joseph Peter Grace, Jr. (hereinafter sometimes called "Peter"), May 25, 1913.
>
> Michael P. Grace, II (hereinafter sometimes called "Michael"), August 6, 1917.
>
> Janet Maureen Grace (hereinafter sometimes called "Maureen"), December 27, 1924.
>
> Charles MacDonald Grace (hereinafter sometimes called "Charles"), September 13, 1926.

(b) Another child, Nora Grace (hereinafter sometimes called "Nora"), was born to the decedent and Janet Grace. Nora died on August 25, 1935.

4. The decedent was a man of great wealth at the time of his marriage to Janet Grace, and thereafter. Janet Grace, on the other hand, had no wealth or property of her own at the time of her marriage to the decedent, and she did not thereafter inherit any substantial wealth. However, as indicated in subsequent findings, Janet Grace acquired the ownership of extensive property and financial interests during her marriage to the decedent as the result of transfers made by the decedent to her.

5. (a) The decedent exercised supervision and control over, and he made the decisions that were involved in the management of, the business affairs of the family. In performing this function, he made the decisions regarding the management and disposition of the property and financial interests that were in the ownership of Janet Grace. The latter did not concern herself with business matters, but relied on her husband's judgment as to such matters. Janet Grace's time and attention were devoted to her home and to society, music, the theater, the arts, and civic affairs. When the decedent decided that some formal action by Janet Grace was required in connection with the management or disposition of a piece of property or a financial interest that was in her ownership, the decedent customarily would have the appropriate instrument prepared for his wife's signature, and he would then have her execute such instrument.

(b) In managing the business affairs of the family, including the property and financial interests that were in the ownership of Janet Grace, the decedent utilized the services of the Customers' Securities Department of W. R. Grace and Company to assist him by handling the details that were involved in carrying out his decisions.

6. (a) Beginning in about 1911 and continuing thereafter as long as the decedent and Janet Grace lived, their family homestead was a large country estate known as Tullaroan, which was situated near Lakeville in the town of North Hempstead, Nassau County, Long Island, New York. When Tullaroan was first acquired for the Grace family on April 5, 1911, it consisted of a substantial farmhouse located on approximately 167 acres of land. The decedent promptly undertook the development and improvement of the property into a home-

stead for his family. The improvements ultimately included a 65-room colonial-style house for the family residence, several smaller dwellings for members of the household staff, an indoor tennis court, two swimming pools, a polo field, three greenhouses, a garage, a stable, a dog kennel, two cow barns, a bull pen, a pig sty, two chicken houses, and a well and pumphouse to provide a water system for the property. The grounds around the main house were extensively terraced and landscaped.

(b) The decedent paid the purchase price for Tullaroan when it was acquired on April 5, 1911, although title to the property was taken in the name of Janet Grace. The decedent also paid for the construction of the buildings and other improvements at Tullaroan, except that the decedent's uncle, Michael P. Grace, paid for substantial additions to the main residence in about 1920.

7. (a) During the period between April 19, 1917, and July 20, 1926, the decedent transferred property and financial interests to Janet Grace, as indicated in the following table:

| Date of transfer | Property transferred | Book value |
|---|---|---|
| 4-19-17 | 3,000 sh. Ingersoll-Rand Co. | $300,000.00 |
| 5-12-17 | 1,600 sh. W. R. Grace & Co. 2d. Pfd. | 160,000.00 |
| 5-12-17 | 1,600 sh. W.R. Grace & Co., Common | 160,000.00 |
| 6-14-18 | 250 sh. Ingersoll-Rand Co. | 25,000.00 |
| 6-14-18 | 1,000 sh. W. R. Grace & Co., Common | 100,000.00 |
| 3-27-19 | 20,000 sh. Grace Bros. & Co., Ltd | 48,686.00 |
| 3-27-19 | 1,106 sh. W. R. Grace & Co., 2d. Pfd. | 114,100.00 |
| 3-27-19 | 1,500 sh. Ingersoll-Rand Co. | 150,000.00 |
| 12-31-19 | 1,000 sh. W. R. Grace & Co., Common | 100,000.00 |
| 12-31-19 | 1,000 sh. Ingersoll-Rand Co. | 100,000.00 |
| 12-31-20 | Smoketown Property | 4,409.73 |
| 5-3-22 | 325 sh. Ingersoll-Rand | 32,500.00 |
| 6-5-22 | 50 sh. A&P SS Co., Common | 5,000.00 |
| 6-6-22 | 334 sh. W. R. Grace & Co., 2d. Pfd. | 33,400.00 |
| 11-8-23 | 756 sh. W. R. Grace & Co., Pfd. | 75,600.00 |
| 11-8-23 | 50 sh. The Evergreens | 6,435.00 |
| 11-8-23 | 150 sh. Terminal Whse. Co. | 9,104.46 |
| 11-8-23 | 400 sh. National City Bank of N.Y. | 113,148.50 |
| 11-8-23 | 100 sh. National City Co. | no value. |
| 11-8-23 | 66 sh. Lincoln Safe Deposit Co. | 12,660.00 |
| 12-20-23 | Cash | 25,000.00 |
| 7-20-26 | Cash (loans treated as gifts) | 135,000.00 |
| 7-20-26 | Tennis Court Building | 97,725.97 |

(b) On May 10, 1929, the decedent deeded to Janet Grace a large tract of land known as the Arthur Farm Property, which was located immediately adjacent to Tullaroan. At the time of the transfer, this property had a book value of $72,715.18.

8. (a) During the period between August 26, 1920, and June 5, 1930, the decedent created trusts for the benefit of his children, as indicated in the following table:

| Date of transfer | Property transferred | Beneficiary | Book value |
|---|---|---|---|
| 8-26-20 | 8,000 sh. Grace Bros. & Co., Ltd. | Peter | 0 |
| 8-26-20 | 8,000 sh. Grace Bros. & Co., Ltd. | Michael | 0 |
| 8-26-20 | 8,000 sh. Grace Bros. & Co., Ltd. | Nora | $97.37 |
| 1-15-25 | 8,000 sh. Grace Bros. & Co., Ltd. | Maureen | 24,000.00 |
| 2- 2-26 | 1,000 sh. Grace Bros. & Co., Ltd. | Peter | 3,000.00 |
| 2- 2-26 | 1,000 sh. Grace Bros. & Co., Ltd. | Michael | 3,000.00 |
| 2- 2-26 | 1,000 sh. Grace Bros. & Co., Ltd. | Nora | 3,000.00 |
| 2-17-26 | 1,000 sh. Grace Bros. & Co., Ltd. | Maureen | 3,000.00 |
| 7- 9-26 | 666 sh. Ingersoll-Rand Co. | Maureen | 22,282.82 |
| 12- 1-27 | 800 sh. Ingersoll-Rand Co. | Nora | 18,453.68 |
| 1- 5-28 | 966 sh. Ingersoll-Rand Co. 166 sh. W. R. Grace & Co., Common. 9,000 sh. Grace Bros. & Co., Ltd. 15 sh. The Evergreens. $5,000 Lake Shore Michigan, So. 4% 1928. 5,000 United Kingdom 5½% 1937. 2,000 Mead Pulp & Paper 5% 1934. 1,000 Ingersoll-Rand Co. 5% 1935. 1,000 Grace Nitrate Co. 6% 1942. 3,000 Terminal Warehouse 5% 1942. | Charles | 60,210.44 |
| 4-30-29 | 60 sh. United Aircraft & Transport Corp | Peter | 1,800.00 |
| 4-30-29 | 60 sh. United Aircraft & Transport Corp | Michael | 1,800.00 |
| 4-30-29 | 60 sh. United Aircraft & Transport Corp | Nora | 1,800.00 |
| 4-30-29 | 60 sh. United Aircraft & Transport Corp | Maureen | 1,800.00 |
| 4-30-29 | 60 sh. United Aircraft & Transport Corp | Charles | 1,800.00 |
| 7-26-29 | $1,000 Kansas City & Southern Railway Co., 1st Mtg., 3% Bond. | Janet | 750.00 |
| 7-26-29 | $1,000 Kansas City & Southern Railway Co., 1st Mtg., 3% Bond. | Charles | 750.00 |
| 4- 4-30 | 20 sh. Lundy's Lane Corp. | Peter | 107,281.71 |
| 4- 4-30 | 20 sh. Lundy's Lane Corp. | Michael | 107,281.71 |
| 4- 4-30 | 20 sh. Lundy's Lane Corp. | Nora | 107,281.71 |
| 4- 4-30 | 20 sh. Lundy's Lane Corp. | Maureen | 107,281.71 |
| 4- 4-30 | 20 sh. Lundy's Lane Corp. | Charles | 107,281.71 |
| 6- 5-30 | $1,000 Kansas City & Southern Ry. Co., 1st Mtg. 3% Bond. | Peter | 750.00 |
| 6- 5-30 | $1,000 Kansas City & Southern Ry. Co., 1st Mtg. 3% Bond. | Michael | 750.00 |
| 6- 5-30 | $1,000 Kansas City & Southern Ry. Co., 1st Mtg. 3% Bond. | Nora | 750.00 |

9. During the period between August 26, 1920, and March 31, 1929, Janet Grace made transfers of assets as follows to or for the benefit of the decedent and their children.

| Date | Book value | Description |
|---|---|---|
| 8-26-20 | $100,000.00 | 20,000 shares Grace Bros. & Co., transferred to account of children. |
| 12-21-24 | 25,000.00 | Transfer to Joseph P. Grace and Janet Grace, as Trustees for Maureen. |
| 9- 1-26 | 10,000.00 | Joseph P. Grace, loan-gift. |
| 1- 5-28 | 3,860.15 | 35 shares, The Evergreens, gift Joseph P. Grace. |
| 3-31-29 | 613,344.32 | Gift to Joseph P. Grace, 200 shares of Lundy's Lane Corp. |

10. In early December of 1931, the decedent conferred with J. Morden Murphy, head of the Customers' Securities Department of W. R. Grace and Company (see finding 5(b)), concerning the creation of additional trusts by the decedent and Janet Grace. The decedent believed that a new gift tax would probably be enacted and become effective early in 1932, and he had decided that additional trusts should be created prior to the close of 1931 in order to avoid paying the new gift tax in connection with the transfers of assets to the trusts. Mr. Murphy furnished to the decedent balance sheets that were maintained for the decedent and Janet Grace, showing the capital assets in their respective ownerships; and the decedent, in consultation with Mr. Murphy, selected the various properties in his ownership and in the ownership of Janet Grace that should be included in the trusts that were to be created by the decedent and Janet Grace. At the time of the conference with Mr. Murphy, the decedent had with him drafts of trust instruments that were to be executed by the decedent and Janet Grace, except for the listing of the properties that were to be included in the respective trusts.

11. (a) Following the conference with J. Morden Murphy referred to in finding 10, and in accordance with the plan of the decedent mentioned in that finding, the decedent on December 15, 1931, executed a trust instrument which created a trust that will be referred to hereafter in the findings as "the Joseph Grace trust." This trust instrument provided in part as follows:

I, Joseph P. Grace, River House Rd., Manhasset of the County of Nassau, State of New York, hereby constitute William R. Grace, Old Westbury, Rd., Old Westbury; William G. Holloway, Store Hill Rd., Old Westbury; and Joseph P. Grace, Power House Rd., Manhasset and their successors Trustees of the property described in Schedule "A" hereunto annexed, which property I have transferred, delivered and hereby assign, transfer, convey and set over to them in trust, subject to the following conditions, powers, rights and limitations.

*First:* I direct the said Trustees to hold the same in trust during the life of my wife, Janet Grace, and to pay the entire net income therefrom to her during her life, together with any amounts of the principal of the said trust, up to and including the whole thereof, which the said Trustees or a majority of them may at any time or from time to time in their sole discretion deem advisable.

*Second:* I direct the said Trustees, upon the death of my said wife, to dispose of the balance of the said trust estate then remaining in their hands, together with all unexpended income thereon, to or for the benefit of such one or more of our issue and myself as my said wife may by will or deed nominate and appoint to receive the same, and in such proportions and on such terms and conditions as she may provide in such appointment, or to the extent that she may not effectively appoint the same, to pay the same to our issue then surviving in equal shares per stirpes, or in default of such issue, to pay the same to those persons who would be entitled thereto if I had died at the date of death of my said wife a resident of the State of New York, intestate and possessed of the same, consisting solely of personal property.

*Third:* I reserve during my life and I give to my said wife after my death the right to direct the Trustees to retain any investment at any time held hereunder and to direct the sale or exchange of any such investment and to designate the stocks, bonds or other property, real or personal, in which the trust estate or any reinvestment thereof shall be invested and to direct the issuance of voting proxies under any stocks held hereunder. I further reserve during my life and I give to my said wife after my death the right to direct the exchange of any property, real or personal, held hereunder for the

stocks, bonds or other securities of any corporation to be formed pursuant to the laws of any jurisdiction whatsoever for the management of such property, and through the voting of proxies issued to me and/or my nominees or after my death to my said wife and/or her nominees by authority hereof, to manage and control any corporation the stock of which may at any time be held hereunder. * * *

*Fourth:* I reserve the right for myself or for any other person to increase the trust estate by delivering, bequeathing or devising property or making insurance policies payable to the Trustees for that purpose.

* * * * *

*Eighth:* In the event of the death, resignation or removal of any of the individual Trustees herein named or of any of their successors, I direct that my said wife, or, if she be dead, the remaining Trustees shall have the power to name an individual or a bank or corporation empowered by law to act in such a capacity, to serve as successor Trustee in the place and stead of any such former Trustee. * * *

(b) In connection with the execution of the trust instrument referred to in paragraph (a) of this finding, the decedent on December 15, 1931, transferred to the Joseph Grace trust the following assets, previously selected by the decedent as indicated in finding 10: 300 shares of the capital stock of the Gilchrest Realty Corporation; 329⅙ shares of the capital stock of Belgrave Realty, Inc.; 150 shares of the capital stock of the Thomaston Corporation; certain real estate referred to as Thomaston Cottage #5, Bell-Brookhaven-Lot 26, 310–312 East 37th Street, and the Yaphank property; and a one-fourth undivided interest in a certain joint venture known as the Grace Harbor Account.

(c) The Gilchrest Realty Corporation was a real estate development company whose assets consisted principally of improved and unimproved properties located on Long Island, New York, including unimproved lots held for sale and improved commercial rental properties, most of which represented the remaining unsold portion of a 58-acre tract of land, with buildings, known as Smith Farm, which the corporation had acquired at the time of its organization in 1916 and had subsequently subdivided, sold lots out of, constructed additional buildings and improvements upon, and otherwise dealt with, plus real estate mortgages derived from sales of such property. The 300 shares of Gilchrest Realty Corporation transferred by the decedent to the Joseph Grace trust represented 20 percent of the 1,500 shares then outstanding, and were all of the shares of the Gilchrest Realty Corporation which the decedent owned. The decedent had acquired 294 of these shares by gift from Lillius Grace, his mother, in 1917, had received 1 share from her estate in 1923, and had purchased 5 shares in or about 1917. The decedent received no dividends on this stock while it was held by him, nor were any dividends received on this stock by the Joseph Grace trust from the date of the creation of that trust to its termination on December 31, 1937.

(d) Belgrave Realty, Inc., was a real estate development corporation whose assets consisted principally of the remaining unsold portion of a 59-acre tract of land located on Long Island, New York, and known as Allen Farm, which the corporation had acquired in 1916 and had subsequently subdivided and sold lots out of, as well as mortgages and cash derived from the sale of lots. The 329⅙ shares of Belgrave Realty, Inc., which the decedent placed in the Joseph Grace trust represented 21.94 percent of the 1,500 shares then outstanding, and were all of the shares of Belgrave Realty, Inc., which the decedent then owned. The decedent had acquired 100 shares of this stock from his mother's estate in 1926, 166⅔ shares were distributed to him by a holding company in 1927, and 50 shares and 12½ shares were received in 1929 and 1930, respectively, from the estate and a testamentary trust under the will of his uncle, Michael P. Grace. No divi-

dends were received by the decedent from Belgrave Realty, Inc., while he held this stock, but the Joseph Grace trust received certain "extraordinary dividends" thereon in 1933 and 1937.

(e) The Thomaston Corporation was a holding or investment company whose assets consisted of common and preferred stocks of various corporations. The 150 shares of Thomaston Corporation stock which the decedent transferred to the Joseph Grace trust on December 15, 1931, represented 19.74 percent of the 760 shares then outstanding, all of which were owned by the decedent prior to that transfer in trust. The decedent had acquired all of the 760 shares on November 8, 1923, in exchange for securities transferred to the corporation. The 150 shares of Thomaston Corporation were distributed to Janet Grace on April 27, 1932, upon directions from the decedent and one of the other two trustees, "in accordance with the power conferred upon them by the first clause of the indenture of 12/15/31." On the same date, Janet Grace made a gift of the same 150 shares of Thomaston Corporation to the decedent.

(f) The real properties referred to as Bell-Brookhaven-Lot 26 and the Yaphank property were unimproved lands situated in the town of Brookhaven, Suffolk County, Long Island, New York. The Yaphank property was a large tract of about 1,000 acres. Bell-Brookhaven-Lot 26 consisted of a long, narrow strip between Great South Bay and the Atlantic Ocean, about 125 feet in width and running about 1,251 feet in length between the two bodies of water. Bell-Brookhaven-Lot 26 had been purchased by the decedent on December 21, 1926, at a cost of $56,905.32. The Yaphank property had been purchased by the decedent on August 24, 1928, at a cost of $69,532.50.

(g) The properties known as Thomaston Cottage #5 and 310–312 East 37th Street were improved rental properties having market values of $3,750 and $47,500, respectively, at the date of the creation of the Joseph Grace trust. Thomaston Cottage #5 had been owned by the decedent since July 6, 1893, when he acquired it by deed from his mother, Lillius Grace. The 310–312 East 37th Street buildings had been purchased by the decedent on May 2, 1928, at a total cost of $65,737.16.

(h) The Grace Harbor Account was a real estate development joint venture formed on October 1, 1927, between the five beneficiaries under the will of the decedent's mother, Lillius Grace, and the Gilchrest Realty Corporation, whereby certain real estate belonging to the estate was transferred to the corporation, which undertook to develop, improve, and sell the property, accounting to the beneficiaries for the proceeds thereof; and there was also transferred to the corporation, for the purpose of financing development costs, certain mortgages and 13,275 shares of the common stock of Ingersoll-Rand Company, in which each of the beneficiaries owned an undivided one-fifth interest. The decedent originally owned an undivided one-fifth interest in the Grace Harbor Account; but one of the five owners withdrew in 1928, leaving the decedent owning a one-fourth undivided interest, which he placed in the Joseph Grace trust. At the time of the creation of the Joseph Grace trust, the assets of the Grace Harbor Account consisted principally of the unsold (or sold and reacquired) portion of a tract of land known as Gracefield or Grace Harbor, a number of real estate mortgages, other receivables and cash, and 10,620 shares of Ingersoll-Rand common stock. Gracefield or Grace Harbor originally consisted of about 177 acres, but this tract had been developed and portions of it had been sold prior to the creation of the Joseph Grace trust.

12. (a) On December 30, 1931, Janet Grace, acting in accordance with the plan of the decedent mentioned in finding 10, executed a trust instrument which created a trust that will be referred to hereafter in the findings as "the Janet Grace trust." The trust instrument provided in part as follows:

I, Janet Grace, of the County of Nassau, State of New York, hereby con-

stitute William R. Grace, William G. Holloway and Janet Grace and their successors Trustees of the property described in Schedule "A" hereunto annexed, which property I have transferred and delivered and hereby assign, transfer, convey and set over to them in trust, subject to the following conditions, powers, rights and limitations:

*First:* I direct the said Trustees to hold the same in trust during the life of my husband Joseph P. Grace and to pay the entire net income therefrom to him during his life together with any amounts of the principal of the said trust, up to and including the whole thereof, which the said Trustees or a majority of them may at any time or from time to time deem advisable. I further direct that during the life of my said husband he shall be entitled to the use and occupancy of the real property described in Schedule "A" hereunto annexed or such part thereof as shall not have been conveyed to him in fee pursuant to the provisions of the clause "First".

*Second:* I direct the said Trustees, upon the death of my said husband, to dispose of the balance of the said trust estate then remaining in their hands, together with all unexpended income thereon, to or for the benefit of such one or more of our issue and myself as my said husband may by Will or Deed nominate and appoint to receive the same, and in such proportions and on such terms and conditions as he may provide in such appointment, or to the extent that he may not effectively appoint the same, to pay the same to our issue then surviving, in equal shares per stirpes, or in default of such issue, to pay the same to those persons who would be entitled thereto if I had died at the date of death of my said husband a resident of the State of New York, intestate and possessed of the same, consisting solely of personal property.

*Third:* I give to my said husband the right during his life and I reserve the right after his death to direct the Trustees to retain any investment at any time held hereunder and to direct the sale or exchange of any such investment and to designate the stocks, bonds or other property real or personal in which the trust estate or any reinvestment thereof shall be invested and to direct the issuance of voting proxies under any stocks held hereunder. I further give to my said husband the right during his life and I reserve the right after his death to direct the exchange of any property, real or personal held hereunder for the stocks, bonds or other securities of any corporation to be formed pursuant to the laws of any jurisdiction whatsoever for the management of such property and through the voting of proxies issued to my said husband and/or his nominees or after his death to me and/or my nominees by authority hereof, to manage and control any corporation, the stock of which may at any time be held hereunder. Any such direction made by my said husband or after his death by me shall be in writing and the Trustees are hereby specifically released from all liability for any loss arising from any action taken or omitted to be taken by them at the direction of my said husband or after his death at my direction and from any action taken or omitted to be taken by my said husband and/or his nominees or after his death by me and/or my nominees pursuant to any proxy or proxies issued at his direction and with respect to any corporation controlled by him, the stocks, bonds or other securities of which may at any time be held hereunder. * * *

*Fourth:* I reserve the right for myself or for any other person to increase the trust estate by delivering, bequeathing or devising property or making insurance policies payable to the Trustees for that purpose.

\* \* \* \* \*

*Eighth:* In the event of the death, resignation or removal of any of the Trustees herein named or of any of

their successors, I direct that my said husband, or if he be dead, the remaining Trustees shall have the power to name an individual or a bank or corporation empowered by law to act in such a capacity to serve as successor Trustee in the place and stead of any such former Trustee. * * *

(b) In connection with the execution of the trust instrument referred to in paragraph (a) of this finding, Janet Grace on December 30, 1931, transferred to the Janet Grace trust the following assets, previously selected by the decedent as indicated in finding 10: Tullaroan (see finding 6) and 40 shares of stock in a certain corporation known as Lundy's Lane Corporation.

(c) At the time of the creation of the Joseph Grace trust and the Janet Grace trust, there was no indication that either Janet Grace or the decedent ever expected to leave Tullaroan during their lives; and, in fact, both continued to live there until they died. There was no change whatever in the use and enjoyment of the homestead by the decedent, Janet Grace, and their children as a result of the transfer of the legal title from Janet Grace to the trustees of the Janet Grace trust.

(d) Lundy's Lane Corporation was a personal holding company incorporated on behalf of Janet Grace on November 9, 1923, at which time she received 607 shares of Lundy's Lane stock in exchange for 12,000 shares of Ingersoll-Rand Company stock, 3,600 shares of W. R. Grace and Company common stock, and 3,040 shares of W. R. Grace and Company second preferred stock. All of the latter securities had been received by Janet Grace as gifts from the decedent at various times during the years 1917, 1918, 1919, and 1922. Of the 607 shares of Lundy's Lane Corporation stock originally owned by Janet Grace (which were all of the outstanding shares of the corporation at all times material to this litigation), Janet Grace made a gift of 200 shares to the decedent on March 31, 1929, and the decedent in turn made gifts totaling 100 shares to trusts for his five children (20 shares each) on April 4, 1930. On December 30, 1931, immediately prior to the creation of the Janet Grace trust, Janet Grace owned 407 shares of the stock of Lundy's Lane Corporation; and after the transfer of 40 shares to that trust on December 30, 1931, the stock was held as follows:

| | |
|---|---|
| Janet Grace trust | 40 shares |
| Decedent | 100 shares |
| Five trusts for children (20 shares each) | 100 shares |
| Janet Grace | 367 shares |
| Total stock outstanding | 607 shares |

(e) There is nothing in the evidence to indicate that Janet Grace, when she signed the instrument creating the Janet Grace trust and transferred property to that trust, was aware that the decedent had created the Joseph Grace trust.

13. The similarity between the trust instruments creating the Joseph Grace trust and the Janet Grace trust, as indicated in findings 11(a) and 12(a), also obtained with respect to the portions of the respective trust instruments which have been omitted from the findings.

14. At the time of the creation of the Janet Grace trust on December 30, 1931, Janet Grace owned substantial properties. The capital account on her books showed a net worth at book value of $3,633,113.26 on December 31, 1931, after the creation of the Janet Grace trust.

15. In connection with the creation of the Joseph Grace trust and the Janet Grace trust, neither the decedent nor Janet Grace had any desire to acquire property from the other. Instead, the motivation behind the creation of these

trusts was the desire of the decedent to effect transfers of assets among, and for the benefit of, members of the family with a minimum of gift-tax consequences.

16. (a) Subsequent to the creation of the Joseph Grace trust on December 15, 1931, the decedent created trusts for the benefit of his children, as indicated in the following table:

| Date of transfer | Property transferred | Beneficiary | Book value |
|---|---|---|---|
| 12-28-35 | $20,000.00 Gilchrest Realty Corp., 2½% Notes due April 1, 1921. | Maureen | $20,000.00 |
| 12-28-35 | Two parcels of real property in Manhasset, Nassau Co., N.Y.; 112 sh. W. R. Grace & Co., Pref.; 238 sh. W. R. Grace & Co. Pref. | Maureen and Charles. | 66,955.00 |
| 12-31-35 | 6 sh. Lundy's Lane Corp | Michael | 83,258.46 |
| 12- 2-37 | 100 sh. Ingersoll-Rand Co | Peter | 9,450.00 |
| 12- 2-37 | 100 sh. Ingersoll-Rand Co | Michael | 9,450.00 |
| 12- 2-37 | 100 sh. Ingersoll-Rand Co | Maureen | 9,450.00 |
| 12- 2-37 | 100 sh. Ingersoll-Rand Co | Charles | 9,450.00 |
| 2-21-38 | 3% interest in real property situated at Northwest, Town of Easthampton, Suffolk Co., N.Y. | Maureen and Charles. | 7,307.03 |
| 11-24-39 | 4,000 sh. Ingersoll-Rand Co | Maureen and Charles. | 197,134.48 |

(b) In addition to creating the trusts referred to in paragraph (a) of this finding, the decedent subsequent to December 15, 1931, transferred assets directly to his children, as follows:

| Date | Property transferred | Transferee | Book value |
|---|---|---|---|
| 10-20-37 | 1/2 share Lundy's Lane Corp | Peter | |
| 10-20-37 | 1/2 share Lundy's Lane Corp | Michael | $10,728.17 |
| 10-20-37 | 1/2 share Lundy's Lane Corp | Maureen | |
| 10-20-37 | 1/2 share Lundy's Lane Corp | Charles | |
| 9-11-39 | 225 sh. W. R. Grace & Co., Common | Peter | |
| 9-11-39 | 225 sh. W. R. Grace & Co., Common | Michael | 69,981.32 |
| 9-11-39 | 225 sh. W. R. Grace & Co., Common | Maureen | |
| 9-11-39 | 225 sh. W. R. Grace & Co., Common | Charles | |
| 11-24-39 | 2,000 sh. Ingersoll-Rand Co | Michael | 197,134.48 |
| 11-24-39 | 2,000 sh. Ingersoll-Rand Co | Peter | |
| 12- 4-40 | 200 sh. Ingersoll-Rand Co | Peter | 3,400.00 |
| 12- 4-40 | 200 sh. Ingersoll-Rand Co | Michael | 3,400.00 |
| 12- 4-40 | 200 sh. Ingersoll-Rand Co | Maureen | 3,400.00 |
| 12- 4-40 | 200 sh. Ingersoll-Rand Co | Charles | 3,400.00 |
| 12-24-40 | 250 sh. Ingersoll-Rand Co | Peter | 4,250.00 |
| 12-24-40 | 250 sh. Ingersoll-Rand Co | Michael | 4,250.00 |
| 12-24-40 | 250 sh. Ingersoll-Rand Co | Maureen | 4,250.00 |
| 12-24-40 | 250 sh. Ingersoll-Rand Co | Charles | 4,250.00 |
| 5-13-41 | 500 sh. Ingersoll-Rand Co | Peter's wife | 8,500.00 |
| 5-13-41 | 500 sh. Ingersoll-Rand Co | Michael | 8,500.00 |
| 5-13-41 | 500 sh. Ingersoll-Rand Co | Maureen | 8,500.00 |
| 5-13-41 | 500 sh. Ingersoll-Rand Co | Charles | 8,500.00 |
| 5-14-42 | 40 sh. Northern Ins. Co | Peter | |
| 5-14-42 | 40 sh. Northern Ins. Co | Michael | 6,400.00 |
| 5-14-42 | 40 sh. Northern Ins. Co | Maureen | |
| 5-14-42 | 40 sh. Northern Ins. Co | Charles | |
| 5-14-42 | 1/4 int. Lakeville Vanhorn Prop | Peter | |
| 5-14-42 | 1/4 int. Lakeville Vanhorn Prop | Michael | 2,910.13 |
| 5-14-42 | 1/4 int. Lakeville Vanhorn Prop | Maureen | |
| 5-14-42 | 1/4 int. Lakeville Vanhorn Prop | Charles | |
| 5-14-42 | 1/4 int. Blakeley Valley Rd. Prop | Peter | |
| 5-14-42 | 1/4 int. Blakeley Valley Rd. Prop | Michael | 455.25 |
| 5-14-42 | 1/4 int. Blakeley Valley Rd. Prop | Maureen | |
| 5-14-42 | 1/4 int. Blakeley Valley Rd. Prop | Charles | |

17.  Subsequent to December 30, 1931, Janet Grace made transfers of assets as follows to or for the benefit of the decedent and their children:

| Date | Book value | Description |
|---|---|---|
| 4-27-32 | $173,434.50 | Gift to Joseph P. Grace, 150 shares Thomaston Corp., cap. stock. |
| 12-28-35 | 180,268.89 | Donated to J. P. Grace, Janet Grace, and J. P. Grace, Jr., as Trustees for Maureen and Charles, 114 sh. W. R. Grace & Co., Pfd. stock, ½ interest in Providence Island Property, 38% interest in a certain $330,523.40 mortgage. |
| 12-31-35 | 10,728.17 | 2 shares Lundy's Lane Corp. stock donated to J. P. Grace, Janet Grace, and J. P. Grace, Jr., as Trustees for Michael. |
| 12-31-36 | 24,971.30 | 13,350 shares Grace Bros. & Co., Ltd., gifts to Joseph P. Grace and Janet Grace, as Trustees under instruments dated 8/26/20, 8/26/20, 1/15/25, and 1/5/28, for the benefit of Peter, Michael, Maureen, and Charles, respectively, 3,339 each. |
| 10-20-37 | 10,728.17 | Gifts to each of four children of 2 shares, in all, of Lundy's Lane Corp. |
| 12- 2-37 | 15,310.00 | Gifts of 400 shares of National City Bank to Janet Grace and Joseph P. Grace, as Trustees of 4 trusts created 8/26/20, 8/26/20, 1/5/20, and 1/5/28, for the benefit of Peter, Michael, Maureen, and Charles, respectively (100 shares each). |

18.  (a) Janet Grace died on December 31, 1937, at the age of 53 years.

(a) At the time of her death, Janet Grace owned substantial properties. The capital account on her books showed a net worth at book value of $3,550,131.04. Her gross estate (excluding the Janet Grace trust) was valued for Federal estate tax purposes at a total value of $5,550,481.78.

19.  Janet Grace continued to act as one of the three trustees of the Janet Grace trust until her death. On January 13, 1938, the decedent, pursuant to a power vested in him under the terms of the trust instrument, appointed Joseph P. Grace, Jr., as successor trustee in the place and stead of Janet Grace, by reason of her death. By reason of the death of another of the original trustees, William R. Grace, on March 31, 1943, Daniel C. Keefe was appointed on May 20, 1943, as successor trustee in the place and stead of William R. Grace, and accepted the appointment on May 21, 1943. From the latter date until the death of the decedent, William G. Holloway, Joseph P. Grace, Jr., and Daniel C. Keefe continued to act as trustees of the Janet Grace trust. The decedent was never a trustee of the Janet Grace trust.

20.  (a) During the 6-year period between the creation of the Joseph Grace trust on December 15, 1931, and the death of Janet Grace on December 31, 1937, income from that trust in the amount of $72,908.45 was paid to Janet Grace pursuant to the terms of the Joseph Grace trust.

(b) At the time of Janet Grace's death, the Joseph Grace trust had on hand undistributed income in the amount of $60,719.28.

(c) A distribution of corpus having a book value of $173,434.50 was made to Janet Grace during her lifetime pursuant to the terms of the Joseph Grace trust.

21.  (a) After the death of Janet Grace, her estate filed a Federal estate tax return, in which the Janet Grace trust was disclosed and reported as a nontaxable transfer by Janet Grace. Following an examination of the return by the Internal Revenue Service, the latter asserted a deficiency on the ground that the Joseph Grace trust and the Janet Grace trust were reciprocal. Negotiations were then conducted between representatives of the Internal Revenue Service and representatives of the estate of Janet Grace. During the course of these negotiations, the representatives of

the estate countered the contention of the Internal Revenue Service by contending that the gross estate should be adjusted by (1) a reduction in the value, as shown on the return, of the shares of stock in Lundy's Lane Corporation owned by Janet Grace at the date of her death, (2) a reduction in the value, as shown on the return, of the shares of stock in W. R. Grace and Company owned by Janet Grace at the date of her death, and (3) elimination from the assets shown on the return as Janet Grace's property of certain household effects which (according to representatives of the estate) belonged to the decedent. As a result of the negotiations, the Internal Revenue Service and the estate of Janet Grace entered into a compromise agreement whereby 55 percent of the total appraised value of the corpus of the Janet Grace trust at the time of her death was included in her taxable estate. This added $336,783.70 to the taxable estate of Janet Grace. As part of the compromise agreement, the estate of Janet Grace abandoned its counter-contentions, as summarized earlier in this finding.

(b) The compromise agreement referred to in paragraph (a) of this finding involved a reciprocal yielding of positions by both sides. The position yielded by the estate of Janet Grace approximated in monetary terms the position yielded by the Internal Revenue Service with respect to 45 percent of the value of the Janet Grace trust. Thus, the effect of the compromise agreement was to include the full appraised value of the corpus of the Janet Grace trust at the time of Janet Grace's death, or $612,334, as part of the taxable estate, and to adjust the valuations of other assets of the estate downward by 45 percent of the amount just stated.

(c) In discussing the issue as to the reciprocity of the Janet Grace trust and the Joseph Grace trust, as indicated in paragraph (a) of this finding, the negotiators believed that the value of the Janet Grace trust was less than the value of the Joseph Grace trust, and that if the doctrine of reciprocal trusts were applicable, it would be the value of the lesser trust, i. e., the Janet Grace trust, that would be taxable as part of the estate of Janet Grace.

22. The decedent died on July 15, 1950, at the age of 73 years.

23. During the period of approximately 18½ years that intervened between the creation of the Janet Grace trust on December 30, 1931, and the decedent's death on July 15, 1950, a total of $389,465.04 was paid to Joseph Grace pursuant to the terms of the Janet Grace trust.[2] In addition, as indicated in finding 12(c), the decedent had the use and enjoyment of Tullaroan as his family home until the time of his death.

24. (a) After the death of the decedent, a Federal estate tax return was filed on behalf of the decedent's estate. In this return, the transfers of assets by the decedent to the Joseph Grace trust were disclosed as transfers not includible in the gross estate, and the Janet Grace trust was reported as a trust under which the decedent held a limited power of appointment. Neither trust was included in the taxable gross estate of the decedent. The trust instruments creating the Joseph Grace trust and the Janet Grace trust were attached to the return as exhibits.

(b) Following an examination of the return referred to in paragraph (a) of this finding, the Internal Revenue Service (in addition to several relatively minor adjustments that are not involved in this litigation) added to the decedent's gross estate the sum of $1,116,888.62, with the following explanation:

Represents reciprocal trust made by decedent's wife, Janet, on Dec. 31 [sic], 1931, for the benefit of decedent. Includible in the gross estate under Section 811(c) of the Internal Revenue Code. A full explanation of

---

2. Of this total, the amount of $47,825.18 was distributable to the decedent during the lifetime of Janet Grace.

this adjustment was given to the estate representatives.

On the basis of this adjustment (and others that are not involved in this litigation), the Internal Revenue Service assessed an estate tax deficiency in the net amount of $363,500.97 against the decedent's estate.

(c) The deficiency of $363,500.97 mentioned in paragraph (b) of this finding, plus assessed interest in the amount of $55,720.08, or a total of $419,221.05, was paid by the decedent's estate on July 14, 1954.

25. Under the date of July 13, 1956, there was filed with the appropriate District Director of Internal Revenue, on behalf of the Estate of Joseph P. Grace, Deceased, a claim for "Refund of Taxes Illegally, Erroneously, or Excessively Collected." The claim for refund stated in part as follows:

Michael P. Grace, II, one of the executors of the Estate of Joseph P. Grace, Deceased (date of death July 15, 1950), is filing this claim for refund for and on behalf of said Estate. As a result of a tax examination of the U. S. Estate Tax return form 706 filed by the Estate of Joseph P. Grace, Deceased, an additional tax of $363,-500.97 was assessed in 1954 and this entire amount was paid on July 14, 1954 together with interest of $55.-720.05.

The additional tax resulted from the fact that the Revenue Agent's Report in connection with the aforementioned examination increased the Estate's valuation by $1,116,888.62 which allegedly "represents reciprocal trust made by decedent's wife Janet on December 31, 1931 for the benefit of decedent." The R.A.R. stated that the aforestated amount was "includible in the gross estate under Section 811(C) of the Internal Revenue Code."

This claim for refund is based on the contention that the aforestated trust was not a reciprocal trust and that same was not includible in the Es-tate of Joseph P Grace under Section 811(C) or under any other Section of the Internal Revenue Code.

\* \* \* \* \*

This claim is for the amount of $419,221.02 plus interest from July 14, 1954. \* \* \*

26. The claim on which this suit is based, as set out in finding 25, had not been disallowed at the time when the petition was filed, and more than 6 months had elapsed since the filing of the claim. No part of the sum so claimed has been credited, refunded, or repaid.

27. The plaintiffs Michael P. Grace, II, Joseph Peter Grace, Jr., and Charles MacDonald Grace are the duly qualified and acting executors of the decedent's estate, and as such are qualified to bring this suit.

28. This court has jurisdiction of the case.

29. The Joseph Grace trust and the Janet Grace trust were not created, and properties were not transferred to these trusts, pursuant to any agreement, express or implied, between the decedent and Janet Grace to make reciprocal transfers of properties.

30. The transfer of property by the decedent to the Joseph Grace trust was not in consideration of the transfer of property by Janet Grace to the Janet Grace trust; and the transfer of property by Janet Grace to the Janet Grace trust was not in consideration of the transfer of property by the decedent to the Joseph Grace trust.

31. In financial matters, Joseph P. Grace was very generous to his wife, Janet Grace. During the period 1911–1929, Mr. Grace transferred (or caused to be transferred) to Mrs. Grace real estate and securities of great value, as well as large amounts of cash (see findings 4, 6, and 7). Janet Grace had practically nothing in the way of wealth when she married Joseph P. Grace, and as a result of his generosity, she ended up having approximately as much wealth as he did. Indeed, Mr. Grace's transfers of

income-producing properties to Mrs. Grace were so extensive that ultimately he became worried over whether the income-producing properties still in his possession would be sufficient to defray the annual expenses for which he was responsible, amounting to at least $200,000 per year. Because of this worry, Mr. Grace had Mrs. Grace retransfer to him some securities that he had previously given to her. For example, on March 31, 1929, Mr. Grace had Mrs. Grace retransfer to him 200 shares of stock in the Lundy's Lane Corporation, having a book value of $613,444.32 (see finding 9). Notwithstanding such retransfers, Mrs. Grace still owned extremely valuable properties as the result of gifts originally received from Mr. Grace.

32. In his relations with his children, Joseph P. Grace was both generous and "trust minded" (see findings 8 and 16). He apparently was motivated by a desire to equalize benefits among the various children.

33. In establishing trusts for the benefit of his children, Joseph P. Grace dealt with J. Morden Murphy, head of the Customers Securities Department of W. R. Grace and Company. Mr. Grace would customarily tell Mr. Murphy for whose benefit he desired to create a trust and the assets that he desired to transfer to the trust. Mr. Murphy, with the assistance of the Legal Department of W. R. Grace and Company, would prepare the necessary papers to effectuate Mr. Grace's wishes, and Mr. Grace would sign them.

34. (a) At the time involved in the present litigation, both W. R. Grace and Company and the Grace National Bank were controlled by the Grace family, of which Joseph P. Grace was generally considered to be the head. The two companies occupied the same building in New York City. Joseph P. Grace maintained his office in the same building.

(b) The Legal Department of W. R. Grace and Company provided legal services not only for that company but also for the Grace National Bank.

(c) The "securities cage" of the Grace National Bank handled the physical delivery and receipt of securities for the bank and for W. R. Grace and Company.

35. J. Morden Murphy was head of the Customers Securities Department of W. R. Grace and Company throughout the period 1930–1931. It was the principal function of that department to manage the securities and real estate of members of the Grace family, most of whom lived in the United States but some of whom lived in England. A great many trusts had been created for various members of the Grace family, and such trusts, together with the securities and real estate in them, were managed by the Customers Securities Department.

36. Alan Ross was employed in the Trust Department of the Grace National Bank throughout the period 1930–1931, and he became head of that department sometime during such period. The Trust Department of the bank did not have any connection with the trusts established for the benefit of members of the Grace family, or with any other aspects of the Grace family's affairs.

37. (a) Alan Ross was very active during the period 1930–1931 in attempting to generate and obtain trust business for the Grace National Bank. He approached many people with respect to the desirability of creating trusts and naming the Grace National Bank as trustee. As one of his promotional activities, Mr. Ross endeavored to interest wealthy married couples of his acquaintance in a plan whereby a husband and wife would each set up a trust for the benefit of the other, each spouse receiving the income for life from the trust created for his or her benefit by the other spouse, and then, upon the death of a spouse-beneficiary, the property in the particular trust would pass to the children of the couple. If only one spouse in a husband-and-wife relationship was wealthy, it was part of Mr. Ross' plan that the wealthy spouse could

transfer property directly to the other spouse, and the husband and wife could then create trusts for the benefit of each other in the manner previously mentioned.

(b) Mr. Ross pointed out to prospective customers that his plan could be utilized for the purpose of equalizing the family income between a husband and wife, and thus effecting annual savings in income taxes.

(c) Mr. Ross also expressed the view to prospective customers that his plan could be utilized to minimize estate taxes upon the deaths of the spouses, provided an adequate period of time—and Mr. Ross suggested at least a year—were permitted to elapse between the creation of the two trusts, so as to avoid a subsequent inference by the taxing authorities that the two trusts were created for the specific purpose of avoiding estate taxes.

38. Alan Ross' plan for husbands and wives in wealthy families to create trusts for the benefit of each other as a means of equalizing income and effecting annual savings in income taxes, and also of ultimately effecting savings in estate taxes if proper precautions were taken in timing the creation of the trusts, was known to, and discussed among, personnel of the Customers Securities Department of W. R. Grace and Company (J. Morden Murphy and his assistant, Allen S. Rupley) and of the Legal Department of W. R. Grace and Company (Howard N. Deyo, Andrew B. Shea, and a Mr. Cogswell). Howard N. Deyo, head of the Legal Department, did not regard the plan as a sound device for minimizing taxes.

39. (a) Alan Ross suggested to Harold J. Roig that the latter and his wife execute trusts for the benefit of each other. Mr. Roig was an attorney and formerly had been head of the Legal Department of W. R. Grace and Company. In 1930–1931, Mr. Roig occupied an executive position in W. R. Grace and Company, and he also occupied an intimate and confidential relationship with Joseph P. Grace.

(b) Mr. Roig was not interested in Mr. Ross' plan.

40. Alan Ross endeavored to interest William Russell Grace, a brother of Joseph P. Grace, in Mr. Ross' plan for the creation of trusts by a husband and wife for the benefit of each other. William Russell Grace was not interested in the Ross plan.

41. (a) Sometime during the latter part of 1930, Alan Ross approached D. Stewart Iglehart, president of W. R. Grace and Company, and suggested that it might be advantageous if Mr. Iglehart and his wife were to create trusts for the benefit of each other.

(b) Mr. Ross suggested to Mr. Iglehart that the latter could possibly save some income taxes annually by splitting up his income-producing properties between himself and his wife, and then the two of them creating trusts for the benefit of each other. Mr. Ross also suggested to Mr. Iglehart that such a plan would result in savings on estate taxes if Mr. Iglehart first created a trust for the benefit of his wife and then Mrs. Iglehart waited for a reasonable length of time (Mr. Ross suggested at least a year) before creating a trust for the benefit of Mr. Iglehart, so that it would not appear that the two trusts were created as part of a single plan to avoid the payment of estate taxes.

(c) Mr. Ross had a number of conferences with Mr. Iglehart, extending over a period of several months, in connection with Mr. Ross' suggestion that Mr. Iglehart and his wife create trusts for the benefit of each other. Mr. Iglehart was interested in the plan, but he had his own ideas concerning certain provisions which the trust instruments should contain. For example, Mr. Iglehart insisted that each trust instrument should contain a provision whereby the life beneficiary would have the power, at will, to withdraw all or any part of the principal of the trust at any time.

(d) As a result of the discussions mentioned in this finding, Mr. Iglehart asked Mr. Ross to draft proposed trust instruments in final form, so that Mr. Iglehart could examine them. A list of the assets that might be included in the two trusts was furnished to Mr. Ross by Mr. Iglehart's secretary, pursuant to instructions from Mr. Iglehart.

(e) In accordance with the authorization from Mr. Iglehart, Mr. Ross prepared final drafts of proposed trust instruments whereby Mr. Iglehart and his wife could create trusts for the benefit of each other. Mr. Ross then submitted the proposed trust instruments to Mr. Iglehart for consideration.

(f) A few days later, Mr. Ross found on his desk the two trust instruments that he had submitted to Mr. Iglehart. The document drafted by Mr. Ross for the creation of a trust by Mr. Iglehart for the benefit of his wife had been signed by Mr. Iglehart on February 9, 1931; and the document drafted by Mr. Ross for the creation of a trust by Mrs. Iglehart for the benefit of her husband had been signed on the same date, i. e., February 9, 1931. The execution of the two trust instruments on the same date was not in accordance with the recommendation as to timing that Mr. Ross had previously made to Mr. Iglehart if savings in estate taxes were to be an objective.

42. D. Stewart Iglehart and Joseph P. Grace had been college classmates, and they were close personal friends. Mr. Grace had brought Mr. Iglehart into the Grace organization. In 1930–1931, Mr. Iglehart was president of W. R. Grace and Company, and Joseph P. Grace was chairman of the board of that company.

43. Alan Ross never discussed the creation of trusts, or business matters of any kind, with Joseph P. Grace. Mr. Ross never met Janet Grace.

44. In some manner that is not shown by the evidence, Joseph P. Grace learned of Alan Ross' plan relative to the creation of trusts by a husband and wife for the benefit of each other. Sometime in 1931, Mr. Grace asked Harold J. Roig what he thought of Mr. Ross' idea respecting such trusts. Mr. Grace did not indicate that he was considering the creation of such trusts, and Mr. Roig did not understand that Mr. Grace was consulting him for legal advice. Mr. Roig responded to Mr. Grace's inquiry by indicating, in effect, that he had not done any legal research on the question, but that it was his "curbstone" opinion that Mr. Ross' plan would not be advantageous in so far as any prospective savings in estate taxes were concerned.

45. (a) With respect to the creation of the Joseph Grace trust of December 15, 1931 and the Janet Grace trust of December 30, 1931 (see findings 10, 11, and 12), there had been no prior consultation concerning any such plan by Mr. Grace with J. Morden Murphy when Mr. Grace, in early December of 1931, informed Mr. Murphy that he (Mr. Grace) wanted to have some trusts created by himself and Mrs. Grace, and that Mr. Murphy should obtain and furnish to Mr. Grace the respective balance sheets of Mr. and Mrs. Grace, showing the assets held at the time by each of them, so that Mr. Grace might select the assets that were to be transferred to the respective trusts.

(b) Mr. Murphy obtained and furnished the two balance sheets to Mr. Grace. Mr. Grace examined the balance sheets, went down each list of assets, and selected the properties that were to be put into the two trusts.

(c) Mr. Grace indicated to Mr. Murphy that he wanted to put into the Joseph Grace trust all the properties of value which he still had and which were of such a nature that they would be suitable to be put in a trust for the lifetime of Mrs. Grace and then go to their children after Mrs. Grace's death.

(d) In connection with the creation of the Janet Grace trust, Mr. Grace selected Tullaroan, the family estate, to be put into that trust, and he also selected 40 shares of stock in the Lundy's Lane Corporation, indicating that the trust

should have sufficient income-producing property to defray the taxes on Tullaroan.

(e) Mr. Grace did not make any statement to Mr. Murphy—or to anyone else, according to the evidence in the record—concerning the reason or reasons for the creation of the two trusts, although he indicated that, from the standpoint of timing, he desired that the creation of the trusts be accomplished promptly in December 1931 because it was his view that a gift tax was "coming along any day now."

(f) It had previously been Mr. Grace's custom, in connection with the creation of trusts for the benefit of his children, to have Mr. Murphy, with the assistance of the Legal Department of W. R. Grace, and Company, draft the necessary instruments to accomplish Mr. Grace's instructions. In connection with the creation of the Joseph Grace and the Janet Grace trusts of December 1931, however, Mr. Grace had in his possession, on the occasion of his first conference with Mr. Murphy, a draft of a trust instrument (or possibly drafts of two such instruments), which Mr. Grace gave to Mr. Murphy. Mr. Grace indicated to Mr. Murphy that the draft was to be used as a model in preparing the final versions of the instruments creating the Joseph Grace trust and the Janet Grace trust of December 1931. The draft was similar in several respects to the instruments creating the Iglehart trusts (see finding 41).

(g) In connection with the creation of the Joseph Grace trust and the Janet Grace trust of December 1931, Mr. Grace did not indicate any desire to equalize the values of the properties that were to be put in the respective trusts. As a matter of fact, there was considerable uncertainty at the time concerning the true market values of the various properties that were transferred to the respective trusts. This was especially true with respect to Tullaroan, the family estate that was placed in the Janet Grace trust, and the pieces of real estate that were placed in the Joseph Grace trust.

It was finally decided that, for the purpose of setting up books of account for the two trusts, approximate values would be assigned to Tullaroan and to the pieces of real estate that were put in the Joseph Grace trust, as it seemed unnecessary to make the considerable effort that would have been required to obtain accurate appraisals.

(h) After Joseph P. Grace had selected the various properties that were to be transferred to the Joseph Grace trust and the Janet Grace trust of December 1931, the final drafts of the documents creating those trusts were prepared in the Legal Department of W. R. Grace and Company. It is inferred that this assignment was relayed to the Legal Department by J. Morden Murphy. The final drafts were modeled on the earlier draft which Mr. Grace had given to Mr. Murphy on the occasion of their first conference concerning the creation of the trusts, although certain changes were made by the Legal Department.

46. (a) During the course of the negotiations between the Internal Revenue Service and the estate of Janet Grace concerning the includability of certain property items in the estate tax return of the estate of Janet Grace (see finding 21), Joseph P. Grace attended a conference with Oscar M. Bate and Robert L. Loeb. Messrs. Bate and Loeb were members of the law firm of McFarlane & Munroe, which was representing the estate of Janet Grace and which also acted as counsel to Joseph P. Grace from time to time with respect to legal matters which Mr. Grace believed to be beyond the competency of the Legal Department of W. R. Grace and Company. At the conference, Mr. Bate, who was senior to Mr. Loeb in their law firm, informed Mr. Grace that the Internal Revenue Service was taking the position that the trusts created by Mr. Grace and his wife in December 1931 were reciprocal trusts and that, under fairly recent court decisions, one of the trusts was includable in the estate tax return of Janet Grace. Mr. Bate advised Mr. Grace that if the trusts were set up in

consideration of each other, the law firm felt that one of the trusts was includable in the estate tax return of Janet Grace, but the firm did not know which one. Mr. Bate further stated that he thought the Internal Revenue Service could probably be persuaded to accept the view that the trust created by Mrs. Grace was the one taxable against her estate, and that this would be advantageous because, at the time of Mrs. Grace's death, the assets in the Janet Grace trust had a considerably smaller value than the assets in the trust created by Mr. Grace.

(b) Mr. Grace, in effect, told Mr. Bate to go ahead and make the best settlement with the Internal Revenue Service that he could.

(c) Mr. Grace, at the conference, did not deny the reported contention by the Internal Revenue Service that the Joseph Grace trust and the Janet Grace trust of December 1931 were created in consideration of each other.

(d) As the result of the negotiations between the Internal Revenue Service and the estate of Janet Grace, a compromise agreement was entered into whereby 55 percent of the total appraised value of the corpus of the Janet Grace trust at the time of her death was included in her taxable estate, and the estate of Janet Grace abandoned the counter-contentions which the estate had asserted during the course of the negotiations, to the effect that certain shares of stock had been over-valued in the estate tax return and that certain household effects previously included in the estate tax return should be eliminated from it.

47. Following the payment of the deficiency and interest in the total amount of $419,221.05 by the estate of Joseph P. Grace on July 14, 1954 (see finding 24), Michael P. Grace, II, one of the sons of Joseph P. Grace and one of the executors of the estate of Joseph P. Grace, proposed to Joseph Peter Grace, Jr., and Charles MacDonald Grace, his two brothers and fellow executors, that a claim for refund be filed by the estate of Joseph P. Grace with the Internal Revenue Service.

48. (a) On June 27, 1956, Joseph Peter Grace, Jr., a son of Joseph P. Grace and one of the executors of the estate of Joseph P. Grace, conferred with his attorney, Judge Burns, of the law firm of Burns, Currie, Maloney & Rice, with Francis Currie, a partner of Judge Burns, with Allen S. Rupley, who was then an official of W. R. Grace and Company, with Mr. Cogswell, of the Legal Department of W. R. Grace and Company, with Mr. Ray, who was then the senior trust officer of the Grace National Bank (the bank being part of the committee for Janet Maureen Grace), and with Robert L. Loeb, counsel for the estate of Janet Grace. The purpose of the conference was to determine whether Joseph Peter Grace, Jr., should join with Michael P. Grace, II, in filing a claim for refund on behalf of the estate of Joseph P. Grace.

(b) Francis Currie had previously conducted an investigation among personnel of W. R. Grace and Company and of the Grace National Bank in an effort to develop as much information as possible concerning the creation of the Joseph Grace trust and the Janet Grace trust of December 1931, and Mr. Currie disclosed to the conferees on June 27, 1956 the results of his investigation.

(c) Robert L. Loeb informed the conferees on June 27, 1956 concerning the conference that he had attended with Joseph P. Grace during the course of the negotiations between the Internal Revenue Service and the estate of Janet Grace (see finding 46). Mr. Loeb said to the conferees on June 27, 1956 that he thought Joseph P. Grace, at the earlier conference, recognized that the two trusts were factually reciprocal, that Mr. Grace did not wish to litigate the issue, and that Mr. Grace wanted to make a settlement.

(d) On the basis of the discussion at the conference on June 27, 1956, Joseph Peter Grace, Jr., instructed his attorney not to join in a claim for refund.

49. (a) On July 9, 1956, Charles MacDonald Grace, a son of Joseph P. Grace and one of the executors of the estate of Joseph P. Grace, attended a conference with his attorney, Judge Burns, with Francis Currie, and with Mr. McDevitt. The other conferees informed Charles MacDonald Grace of the decision previously made by Joseph Peter Grace, Jr., not to join in a claim for refund (see finding 48), and they advised Charles MacDonald Grace that he should also decline to join in such a claim.

(b) In accordance with the advice received by him, Charles MacDonald Grace said at the conference on July 9, 1956 that he would not join in a claim for refund.

50. On August 2, 1956, Francis Currie wrote a letter to Morris W. Primoff, attorney for Michael P. Grace, II, and stated in part as follows:

I am authorized to say that Messrs. Peter and Charles Grace are completely satisfied that the available evidence will not sustain the burden of proof to support the claims for refund filed by Mr. Michael Grace. On the contrary, all available evidence indicates that the trusts in question were specifically intended to be reciprocal, in order to avoid gift taxes which became effective on January 1, 1932, and to avoid estate taxes through a method generally regarded as available prior to the decision in the *Lehman* case. In the light of this evidence of which they are aware, Messrs. Peter and Charles Grace cannot join in the claims for refund filed by Mr. Michael Grace.

Messrs. Peter and Charles Grace have reached this conclusion reluctantly, in view of their personal interests in any refund which might be recovered. The share of Mr. Charles Grace in the amount of federal estate tax and interest which might be recovered if the claim for refund were allowed would be almost $40,000.; the share of Mr. Peter Grace would be over $235,000., considerably larger than the share of Mr. Michael Grace.

I am also authorized to say that Grace National Bank of New York, as a member of the Committee for the Property of Janet Maureen Grace, concurs in the decision of Messrs. Peter and Charles Grace not to join in the claim for refund.

51. (a) The original petition in the present action was filed on September 24, 1959 by Michael P. Grace, II, as an executor of the estate of Joseph P. Grace, deceased.

(b) After the filing of the original petition, the attorney for Michael P. Grace, II, represented to Joseph Peter Grace, Jr., and Charles MacDonald Grace that the claim asserted in the petition might be denied by the court on the ground of defective parties plaintiff. At the request of the attorney for Michael P. Grace, II, and because Joseph Peter Grace, Jr., and Charles MacDonald Grace did not wish to forfeit any money that they might be entitled to receive, Joseph Peter Grace, Jr., and Charles MacDonald Grace decided to join in the prosecution of the case before the Court of Claims.

(c) On August 2, 1963, the first amended petition was filed in the present action by the estate of Joseph P. Grace, deceased, and by Michael P. Grace, II, Joseph Peter Grace, Jr., and Charles MacDonald Grace, executors.

52. The evidence in the record does not indicate that Joseph P. Grace was motivated by the desire to avoid or lessen estate taxes in the setting up of the Joseph Grace trust and the Janet Grace trust in December 1931.

53. The Joseph Grace trust and the Janet Grace trust were created by, or at the instigation of, Joseph P. Grace as parts of what was essentially a single transaction.